**HOWSLEY & JACOBS et al., Petitioners,**

v.

**Mrs. W. S. KENDALL et al., Respondents.**

**No. A-9528.**

Supreme Court of Texas.

Feb. 26, 1964.

Motions for Rehearing Denied
April 1, 1964.

Strasburger, Price, Kelton, Miller & Martin, Dallas, McMahon, Smart, Sprain, Wilson & Camp, Abilene, for petitioners.

Scarborough, Black, Tarpley & Scarborough, Abilene, for respondents.

NORVELL, Justice.

Writ of error was granted in this case because we were of the tentative opinion that the closing argument of respondents' counsel to the jury constituted reversible error. After submission of the case upon briefs and oral argument, we adhere to our tentative opinion. The judgments of the District Court and the Court of Civil Appeals are reversed and the cause remanded to the District Court for another trial.

In the District Court, Mrs. W. S. Kendall and W. S. Kendall, Jr., as beneficiaries under the wrongful death statute, Article 4671, Vernon's Ann.Tex.Stats., and as the legal representatives of W. S. Kendall, recovered judgment against the defendants, described in the judgment as "Andrew Howsley and Charles E. Jacobs, individually and as members of the partnership of Howsley & Jacobs." The Court of Civil Appeals affirmed. 364 S.W.2d 836.

W. S. Kendall was severely burned in an explosion and fire which took place in the basement of the Andrew Howsley residence on the afternoon of March 7, 1961. As a result of these burns, Kendall died shortly after midnight on March 10th in a hospital located in Albany, Texas. The liability of Andrew Howsley and Charles E. Jacobs is predicated upon the theory that Robert Myers was their employee and that the explosion was caused by Myers' negligence. Kendall and Myers were the only persons present at the Howsley residence immediately prior to the explosion. Sharply conflicting versions of the events which

occurred at that time were placed before the jury and the case may be properly described as a close one upon the facts.

The deceased, W. S. Kendall, was an electrician with a place of business in Cisco, Texas. Andrew Howsley is the father-in-law of Charles Jacobs and at the time of Kendall's death he and Jacobs were partners primarily engaged in the oil business. Robert Myers, a young man 24 years of age, was employed by Howsley & Jacobs to clean up oil lease locations of the partnership. He also worked around the houses of both Howsley and Jacobs, took care of their yards and rendered such other services as might be required by either of the partners.

The deceased, W. S. Kendall, was employed to remove two air compressors from the basement of the Howsley residence in Albany and take them to his shop in Cisco for inspection and repair. Howsley instructed Myers to be present when Kendall arrived and help him remove the compressors from the basement and load them onto Kendall's pickup truck. On the afternoon of March 7, 1961, Kendall and Myers removed the compressors from the Howsley basement. Then they noticed that some lubricating oil had spilled or leaked on the floor. Gasoline was poured upon the floor in an effort to remove the oil. Fumes from the gasoline came in contact with the flame of the pilot light on a water heater located in the basement, with the result that an explosion and fire took place.

Myers testified to matters which, if credited, would absolve him from culpability. The respondents' account was that Myers had carelessly used gasoline in cleaning the floor near the burning pilot light and had failed to warn Kendall of this circumstance. This version was pieced together from the testimony of witnesses who related to the jury what Kendall had told them before his death. In the main, these statements were received under an exception to the hearsay rule as being a part of the res gestae.

Robert Myers testified that he helped Kendall get the compressors out of the basement and load them on the truck; that in this process some oil was spilled upon the floor of the basement; that he and Kendall used some rags to wipe up the oil to start with; that Kendall decided that the dry rags would not clean up the oil satisfactorily; that Kendall said, "We will have to clean up this oil off the floor or Mrs. Howsley will get us"; that Kendall asked him if he had any "gas" and he (Myers) told Kendall that he could get some that he used in the lawn mower; that Kendall said that would be "okey" so he got some gasoline in a red two-gallon can and Kendall said, "We will put some on these rags and clean it up, wipe the oil off the floor"; that he, (Myers) "did exactly what he told me to do"; that Mr. Kendall said that the "gasoline wasn't cutting the oil so he (Kendall) poured a little on the floor; that then "the fumes were getting kinda bad in there and (he) told (Kendall) that (he) would go upstairs and get some water and wash some of it out"; that "the fumes were getting so bad (he, Myers) couldn't stay down there, so (he) started upstairs and the thing blowed up"; that he was at the top of the stairs when the explosion occurred; that the explosion was immediately followed by a fire; that he got a garden hose and shot water down on Mr. Kendall who was at the foot of the stairs; that he then went down the stairs so as to get a step or two closer to Mr. Kendall and caught his hand and pulled him out of the basement; that Mr. Kendall was on fire when he pulled him out; that he shot some water on him and used his hands to beat out the fire.

The respondents' (plaintiffs') version of the facts and circumstances immediately before the explosion and fire came primarily from the testimony of the witnesses W. S. Kendall, Jr. and the widow, Mrs. W. S. Kendall. In certain minor particulars they were corroborated by other witnesses. All of respondents' evidence as to the events leading up to the explosion and fire consisted of statements attributed to Mr. Ken-

dall and related to the witnesses in the Albany hospital.

W. S. Kendall, Jr. came to the hospital shortly after his father arrived,—about 4:30 in the afternoon. He found that his father was suffering severe pain but was conscious. He testified that his father told him that some oil had been spilled on the floor out of the compressors and he had wiped it up with a rag; that Robert Myers had gone in there with some gasoline to clean the floor and that he didn't realize what he had used until he went back down there to see if he had left any tools and the whole place was afire.

Mrs. Kendall testified that she arrived at the hospital around 5:00 o'clock and went to her husband's hospital room where she found that "he had been burned all over from the top of his head to his feet and his face was black and he was bandaged all over"; that she remained at the hospital until her husband died; that during this time Mr. Kendall's "consciousness came and went." She testified that her husband told her that "he had taken the compressors out and put them in the pickup and while he was doing that, that Robert had put gasoline on the floor to clean it up and when he went back that he didn't know that any gasoline was there and he was afire before he knew what happened."

We thus have a case in which one version was related by Robert Myers, the only living witness to the events which took place immediately prior to the explosion. He appeared in court and withstood a rigorous cross-examination. The opposing version was placed before the jury under an exception to the hearsay rule and consisted of statements by witnesses of what Kendall had told them. If emotion be laid aside it could perhaps be reasonably expected that the first-hand account of events might carry the greater weight. The credibility of the witness Robert Myers thus became a critical consideration in the case and this circumstance must be borne in mind when considering the probable results flowing from the final argument which was made to the jury by respondents' counsel.

■ We need not discuss the matter of improper argument at great length. We are fully cognizant of the fact that a trial before a jury in Texas is an adversary proceeding. Perhaps the lawyer who, in the heat of advocacy, has never made a remark that would call for a reversal of a judgment has not tried many closely contested cases. However, it is not the attitude, purpose, or motive of counsel that is of controlling importance. The important considerations are what was said and how in all probability such statements were understood by the jury.

In respondents' concluding remarks to the jury, the theory that the witness, Robert Myers, wasn't the actual person giving the testimony but that "somebody was testifying through his lips" runs like a leitmotif through the argument. The suggestion that it was not Myers "that was testifying, but he was following somebody else's instructions" was made repeatedly.

Near the beginning of the argument it was said that:

"All right, when you go to consider the evidence remember another thing and that is this, that we can't bring Mr. Kendall in here to tell us about how this happened. We can't bring him in here to give us his story because his lips have been closed. His lips are sealed. We have to get the statements that he made. It's going to be the statements that he made against the statements of Robert Myers. That's what you are going to have to decide this case on. * * * And let me tell you that when you heard the testimony of Robert Myers you knew the truth. * * * "You knew the truth but you knew it wasn't coming from the testimony of Robert Myers, because Robert Myers wasn't testifying. Somebody was testifying through the lips of Robert Myers. * * * "What did the

colored boy tell you? He said: 'Mr. Howsley instructed me to follow the instructions of Mr. Kendall.' Does that sound like him testifying? No, that's impossible. It's impossible because, ladies and gentleman, it is going to be for you to decide whether the man lying there on his death bed, a man that the evidence shows he knew and realized that he was about to meet his maker, a man that was about to come face to face with his Master, would he be more apt to be telling the truth than a colored boy who had been under the coaching of this battery of lawyers, when he got on there to give words that were not his words."

It was suggested in the oral argument that these statements had reference to the use of leading questions in adducing the testimony of Robert Myers, but upon examination of the statement of facts we find that only one objection was made to the use of a leading question during the course of direct examination and that this objection did not relate to Myers' recital of the occurrences which took place immediately before the explosion.

There is a suggestion in the argument before the trial jury that there was something incongruous in Robert Myers' choice of words in giving his testimony. There was evidence that Mr. Howsley had "instructed" him in the matter of aiding Mr. Kendall, but it is wholly tenuous to connect this circumstance with Myers' account of the events relating directly to the explosion. The testimony of Robert Myers on direct examination relating to the events which took place from the time of the spilling of oil on the basement floor to the time he and Mr. Kendall were taken to the hospital occupies five pages of the Question and Answer Statement of Facts. No objections were made to any of this testimony and we find no question that could be seriously objected to on the ground that it was leading.

■ When we recur to the question of how this argument was probably understood by the jury, it seems inescapable, regardless of how counsel may have intended it or whatever may have been his recollection of the record at the time of the argument, that the jury understood it to be a charge that Mr. Howsley or the "battery of lawyers" who had coached Robert Myers were speaking through Myers' lips, or in other words, had told him what to say and how to testify. Such an argument when based upon evidence is, of course, permissible. When, however, it has no support in the evidence it is highly prejudicial.

In the present case, we find no evidence that Mr. Howsley or his lawyers told Robert Myers how to testify as to the events that preceded the explosion, or that anyone was "speaking through his lips" while he was on the stand.

■■ It is our opinion that from the time the charge was made that someone else was testifying through the lips of Robert Myers, coupled with the statement as to a "battery of lawyers," the petitioners' case was irretrievably prejudiced. An assertion of facts having no evidentiary basis were placed before the jury and these asserted facts were in turn made the basis of an inflammatory appeal. No instruction of the trial judge could have removed the prejudicial effects of the argument and hence no objection was necessary to preserve the error. Southern Pacific Company v. Hubbard, 156 Tex. 525, 297 S.W.2d 120 (1956); Southwestern Greyhound Lines v. Dickson, 149 Tex. 599, 236 S.W.2d 115 (1951); See also, Texas Employers' Ins. Ass'n v. Haywood, 153 Tex. 242, 266 S.W.2d 86 (1954); Wade v. Texas Employers' Ins. Ass'n., 150 Tex. 557, 244 S.W.2d 197 (1951). Compare, Scoggins v. Curtiss & Taylor, 148 Tex. 15, 219 S.W.2d 451 (1949); Willis v. McNeill, 57 Tex. 465 (1882).

■ As for the other matters raised in the application for writ of error, we are of the opinion that they were decided correctly by the Court of Civil Appeals with one ex-

ception. In the absence of some additional predicate to that disclosed by the present record, Mrs. Kendall's statement that Mrs. Howsley said that "Robert shouldn't have done that", evidently referring to his supposed use of gasoline in cleaning the basement floor, should not be received in evidence as an admission. Mrs. Howsley was not at home at the time of the explosion; her purported statement was conclusory in nature and appears to have been a chance remark made in a conversation at the hospital where Kendall and Myers were taken after the tragic events above detailed.

What is said in this opinion and in the opinion of the Court of Civil Appeals will serve as an ample guide for the district court upon a re-trial of this case.

██ Andrew Howsley filed an application for writ of error in this case in addition to that filed on behalf of Howsley & Jacobs, a partnership composed of Andrew Howsley and Charles E. Jacobs. It is stated in the application that Andrew Howsley, in his individual capacity, i. e., not as a member of the partnership of Howsley & Jacobs, carried a personal liability policy with an insurance carrier which is different from the company carrying liability insurance for the firm of Howsley & Jacobs. He complains of the form of the judgment rendered because it fails to set out that such judgment is "predicated only upon the vicarious liability imposed upon him by the liability of the partnership." It doesn't make any difference insofar as the respondents and Howsley are concerned whether liability is, or (in view of our reversal) may be predicated upon the proposition that Robert Myers was the employee of the firm in which Howsley was a partner, or was the employee of Howsley alone. Howsley's liability in either event would be such as to render him personally accountable for the damages sustained by Kendall's widow and son. There was no error in the form of the judgment rendered by the trial court in the particular complained of. The positions of the two insurance companies with reference to the assertion of liability against their insured may present an interesting legal question, but that problem is not in this case. The matter of insurance, if any, and how and with whom it is carried, is wholly immaterial to this litigation.

An order of reversal and remand will be entered as above indicated.