STANDARD FIRE INSURANCE
COMPANY, Petitioner,

v.

Arthur REESE, Jr., Respondent.

No. B–7799.

Supreme Court of Texas.

June 6, 1979.

Thurlow & Hennessey, Edward J. Hennessey and Randall D. Wilkins, Houston, for petitioner.

Stevens F. Mafrige and George A. Sellnau, Houston, for respondent.

POPE, Justice.

The question presented by this appeal is whether plaintiff, Arthur Reese, Jr., sustained his burden to prove that a jury argument made by counsel for Standard Fire Insurance Company constituted reversible error in the absence of an objection or motion that the court instruct the jury to disregard the argument. The Industrial Accident Board had awarded Reese $1,120.00 for temporary total incapacity, $2,528.10 for permanent partial incapacity and $1,329.00 for medical expenses, a total of $4,977.10. Standard appealed, and the trial court rendered judgment for Reese on a jury verdict for the sum of $870.00 for total incapacity for the period from March 14, 1975, to June 10, 1975; medical benefits in the sum of $1,239.00, and interest in the amount of $179.91, for a total of $2,278.91. The judgment should have been for $2,288.91. Mr. Reese, the worker, appealed from that judgment, and the court of civil appeals reversed the judgment by reason of a jury argument. 567 S.W.2d 861. From our review of the whole record, we conclude that the argument by Standard's attorney was neither improper nor reversibly harmful. We reverse the judgment of the court of civil appeals and affirm the judgment of the trial court.

Counsel for Standard Fire Insurance Company made this jury argument which is the basis for the reversal by the court of civil appeals:

But that won't make this claim valuable enough. So, we have to run in Dr. Buning. Enter Dr. Buning, April 8, 1975, approximately three and a half weeks after this incident. Dr. Buning in Spring Branch, Mr. Reese, Astrodome. He drove by a thousand doctors between the Astrodome and Spring Branch. Aren't you curious as to why he went to Dr. Buning? Aren't you curious as to why Mr. Mafrige sent him to Dr. Buning? Does not a sham or a plot evolve out of all of this? What does Buning do then? Let's send him over to old Mort, give him the old 1–6–8–9–11–15 treatment. That's good. That looks good on paper. We can pump on him for about six or eight weeks, build those medical bills up real high. The higher the medical bills, obviously he has got to be hurt if he has got all of those medical bills. It will look good in front of a jury. Does that not make itself abundantly clear to you? Does that not eat away at the credibility of this entire situation?

Reese's counsel neither objected to the argument nor asked the court to give any instruction to the jury about it. Standard's trial theory and its argument was that Reese had incurred unnecessary charges for physical therapy in the amount of $1,458.00 even though the treatments were doing him no good. Standard attacked the credibility of the worker's claim in light of the evidence that Reese resumed regular employment a short time after his initial treatment, worked full time and earned more money than he had ever earned before. Standard's counsel also argued that two doctors had examined Reese and released him as able to return to work, and those two doctors had not testified. He then argued that the evidence showed that Reese received therapy from April to June of 1975, was released from further treatments, but resumed those unnecessary treatments seven months later for the purpose of building up the amount of the medical expenses. He questioned whether Reese had any disability at all, and he argued that the decision in the case would turn upon Reese's credibility. He then continued,

Maybe you all feel like I am rationalizing. Maybe I am. But Mr. Reese, when he tells you he is hurt and can't do this and can't do that and will never ever be the same again, maybe Mr. Reese really believes that. And if he does, then he is

telling the truth. But it is not credible, folks. It is not credible when you put all of these facts together, when you put in the Mafrige-Bachynsky-Buning combination—

MR. MAFRIGE: Your Honor, I object. There is no evidence of any combination and he keeps making inferences and slanderous remarks and I strenuously object. He is outside the record.

THE COURT: You may reply to that on closing argument.

The argument was not improper because there was direct evidence, as well as inferences from the evidence, which supported the argument. Mr. Reese testified that he was on his job on March 14, 1975, performing his work as a cement worker. He was standing in about six inches of cement when he sustained a "pop" in his back. Another employee helped him step from the cement, and Reese's employer immediately had him taken to the Torno Medical Center that was located in Pasadena near the job site. Dr. Torno examined and treated Reese for about a month. He prescribed physical therapy treatments which Reese received for an estimated five or ten times. Dr. Torno, in turn, referred Reese to a Dr. Podniac, an orthopedic surgeon. Both of those doctors, after about six weeks, dismissed Reese as able to return to work. At that point, Reese went to see Dr. Eric Buning, whom he not previously known.

Dr. Buning's office was at that time located in Spring Branch. Reese testified that he went to see Dr. Buning because his lawyer sent him. Mr. Mafrige was his lawyer. Reese also testified that he lived in South Park near the Astrodome. When Mr. Mafrige was questioning Reese, his client, there was this exchange:

"Q. How was it you got to Dr. Buning's office?

"A. You sent me to Dr. Buning.

"Q. Your lawyer did?

"A. Yes."

Reese was hurt on Friday, March 14, 1975; he went to see his lawyer four days later. There are three pharmacy bills in evidence. They are in the name of Arthur Reese but have typed on each of them the notation, "bill Steven F. Mafrige," who was Reese's attorney.

Dr. Buning, after examining Reese, prescribed physical therapy which he detailed on a printed prescription form. The prescription that Dr. Buning signed was not on Dr. Buning's prescription form; it was on the prescription bearing the name of Mort Moriarty, L.P.T. (licensed physical therapist). Mr. Moriarty had his offices in the same building in which Dr. Buning was located. Mr. Moriarty testified that he and Dr. Buning were personal friends. Dr. Buning "would just come by and visit the office. He had time to kill," he said.

Dr. Buning wrote two different prescriptions for physical therapy. The first one was for the treatments from April 8, 1975, until June 9, when they were terminated on orders from Dr. Buning. Dr. Buning wrote a second prescription about seven months later on January 5, 1976, calling for daily treatments for two to four weeks. On that same date Reese resumed his treatments, and they continued until March 5, 1976. By that time the bill for physical therapy had grown to the amount of $1,458.00.

Dr. Buning died sometime about February, 1976, and Dr. Nicholas Bachynsky took over his office and patients. He saw Reese on March 2 and March 10, made an examination but prescribed no treatment. Dr. Bachynsky testified that he did not prescribe therapy treatments, because "I don't think it would have any benefit to him." Reese did not return to Dr. Bachynsky until November 2, 1976, and then, according to the evidence, because "The lawyer wanted him to come by for re-evaluation." Dr. Bachynsky's total charges amounted only to $50.00. He expressed the opinion that Reese suffered from pain caused by a nerve root impingement and also degenerative arthritis, that Reese did not have any symptom that could be called an objective one, that every symptom of the injury required his reliance upon the credibility of the patient, and that in his opinion, Reese had a sixty percent permanent disability. That opinion statement is the only evidence in

the record of the extent of Reese's incapacity.

The jury argument about Mr. Moriarty's therapy treatments cannot be understood except in the context of this additional evidence. Mr. Moriarty testified that his billings listed twenty-one different kinds of therapy which he was capable of providing. They were numerically coded at the bottom of each statement. For example, the treatments he gave Mr. Reese were coded in this fashion, as he explained:

"Q. Like No. 1 is hot packs. No. 6 is ultrasound. No. 8 is massage. No. 9 is electrical stimulation. No. 11 is therapeutic exercise. And No. 15—

"A. Pelvic traction.

"Q. Intermittent pelvic traction, right. Now it looks to me like you gave him the 1–6–8–9–11–15 treatment every time he was there.

"A. Because that's what was prescribed."

Standard's defense was that Reese's claim was a weak one and had almost no medical basis. Two physicians released him as able to do work, and the evidence showed that he returned to work in 1976, worked continuously as a cement worker and earned more than he had ever earned before. Standard urged that the only evidence of any incapacity rested upon Reese's own subjective statements, as Dr. Bachynsky acknowledged.

From this record, we conclude that there was direct evidence of a close relationship between Reese's attorney, Mr. Maffrige, and Dr. Buning, Morton Moriarty, and Dr. Bachynsky. Whether by cross-examination or advocacy, the relationship between witnesses and a party is properly weighed, evaluated, and tested. It is the jury's function to evaluate the evidence in that context.

Standard's argument that Reese "drove by a thousand doctors between the Astrodome and Spring Branch" to see Dr. Buning was not improper. Hyperbole has long been one of the figurative techniques of oral advocacy. Such arguments are a part of our legal heritage and language. Shakespeare wrote about "a thousand blushing apparitions" and "a thousand innocent shames," in *Much Ado About Nothing*. In the *Tempest* he wrote, "Now would I give a thousand furlongs of sea for an acre of barren ground"; in *King Richard III*, "My conscience hath a thousand several tongues, and every tongue brings in a several tale . . . ."; in *Hamlet*, "And by a sleep to say we end the heartache and the thousand natural shocks that flesh is heir to"; in *Hamlet* again, "To be honest, as this world goes, is to be one man picked out of ten thousand," and in *Romeo and Juliet*, he has Juliet saying, "A thousand times goodnight!" The method has often been employed to make a point.[1]

---

1. "Those thousand decencies that daily flow from all her words and actions." John Milton, *Paradise Lost*.

"Thousands at his bidding speed,
And post o'er land and ocean without rest;
They also serve who only stand and wait." Milton, *On the Late Massacre in Piedmont*.

"But thousands die without or this or that
Die, and endow a college or a cat." Alexander Pope, *Moral Essays, Epistle III*.

"Man's inhumanity to man
Makes countless thousands mourn." Robert Burns, *Man Was Made to Mourn*.

"And homeless near a thousand homes I stood,
And near a thousand tables pined and wanted food." William Wordsworth, *Guilt and Sorrow*.

"Strange that a harp of thousand strings
Should keep in tune so long!" Isaac Watts, *Hymns and Spiritual Songs*.

"The lamps shown o'er fair women and brave men.
A thousand hearts beat happily." Lord Byron, *Childe Harold's Pilgrimage*.

"He left a corsair's name to other times,
Link'd with one virtue, and a thousand crimes." Lord Byron, *The Corsair*.

"But in vayne shee did conjure him
To depart her presence soe;
Having a thousand tongues to allure him,
And but one to bid him goe." Thomas Percy, *King John and The Abbot of Canterbury*.

"If winged thoughts that flit to thee—a thousand in an hour." John Moultrie, *Forget Thee*.

"Earth with her thousand voices, praises God." Samuel Taylor Coleridge, *Hymn in the Vale of Chamouni*.

"Ring out old shapes of foul disease,
Ring out the narrowing lust of gold;
Ring out the thousand wars of old,

### The Harmless Error Rule

The harmless error rule is one that ebbs and flows. Its very existence contemplates that an error has been committed, but judicial expectations for perfect trials find presumed harm continually contending for a revival.[2] In 1941, after an inconsistent history which saw appellate courts alternately range between a burden on the winner to prove no-harm to that of a burden on the loser to prove harm, Texas adopted Rules 434 and 503 and harmless error. Its intended effect was uncertain at first. *See Airline Motor Coaches, Inc. v. Bennett*, 144 Tex. 36, 187 S.W.2d 982 (1945); *Myers v. Thomas*, 143 Tex. 502, 186 S.W.2d 811 (1945); *Rojas v. Vuocolo*, 142 Tex. 152, 177 S.W.2d 962 (1944); *Dallas Ry. & Term. Co. v. Hendricks*, 140 Tex. 93, 166 S.W.2d 116 (1942).

 Harmless error creeps back into the practice when subjective evaluations re-

place a more objective and structured testing of error. For that reason, decisions since 1941 have resisted the tide of presumed harm by surrounding the decision about reversibility with several tests. In the case of improper jury argument, the complainant must prove a number of things. He has the burden to prove (1) an error (2) that was not invited or provoked, (3) that was preserved by the proper trial predicate, such as an objection, a motion to instruct, or a motion for mistrial, and (4) was not curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the judge. 3 McDonald, Texas Civil Practice § 13.17.2 (1970). There are only rare instances of incurable harm from improper argument. The complainant has the further burden to prove (5) that the argument by its nature, degree and extent constituted reversibly harmful error. How

Ring in the thousand years of peace." Alfred Lord Tennyson, *In Memoriam.*

"There are a thousand hacking at the branches of evil to one who is striking at the root." Henry David Thoreau, *Walden.*

"Hundreds of people can talk for one who can think, but thousands can think for one who can see." John Ruskin, *Modern Painters.*

"The lowliest men would sooner face
A thousand dreadful deaths, than come
Before their loved ones in disgrace." John Davidson, *A Ballad of a Coward.*

"One man in a thousand, Solomon says,
Will stick more close than a brother." Rudyard Kipling, *The Thousandth Man.*

"For every beast of the forest is mine, and the cattle upon a thousand hills." *Psalms* 50:10.

Ed McMahon to Karnack, the Mystic from the East, April 4, 1979, "A thousand welcomes to you." Tonight Show, NBC.

Sadat on April 5, 1979, "Any act of terrorism against Egypt will be repaid one thousand fold."

2. Mr. Justice Calvert in *The Development of the Doctrine of Harmless Error in Texas*, 31 Texas L.Rev. 1 (1952), traces this vascillating history. Prior to 1835, the orthodox rule of harmless error prevailed in England. In that year *Crease v. Barrett*, 1 Cr. M. & R. 919, 149 Eng.Rep. 1353 (1835), reverted to the presumed harm rule. The "heresy," so-called by Wigmore, continued until the rule of harmless error was restored by rule of court. 1 Wigmore, Evidence 367 (3d ed. 1940). By 1864, Texas had fallen into the practice of presuming harm because of an error. *Bailey v. Mills*, 27 Tex.

434, 438 (1864); *see also Lee v. Hamilton*, 12 Tex. 413, 419 (1854). It was not until 1912 that the supreme court by its Rule 62a, 149 S.W. x (1912), returned the standard for review to that of harmless error. But Rule 62a was promptly disregarded less than two years later, *Scott v. Townsend*, 106 Tex. 322, 166 S.W. 1138 (1914), and presumed harm tenaciously regained its former stature. *San Antonio v. McKenzie Construction Co.*, 136 Tex. 315, 150 S.W.2d 989 (1941); *Traders & General Ins. Co. v. Lincecum*, 130 Tex. 220, 107 S.W.2d 585 (1937); *Chapin v. Putnam Supply Co.*, 124 Tex. 247, 76 S.W.2d 469 (1934); *International Travelers' Ass'n v. Bettis*, 120 Tex. 67, 35 S.W.2d 1040 (1931); *Golden v. Odiorne*, 112 Tex. 544, 249 S.W. 822 (1923); *Eastern Texas Electric Co. v. Baker*, 254 S.W. 933 (Tex.Comm'n App.1923). The disregard for Rule 62a resulted in mounting criticism. *See* Alexander, *Proceedings of Association of Appellate Judges*, 10 Texas L.Rev. 188, 189 (1932); McKnight, *Suggestion for Improving Court Procedure in Texas*, 6 Texas L.Rev. 59, 76 (1927); *Report of Texas Civil Judicial Council*, 11 Texas L.Rev. 204, 206 (1933); State Bar of Texas, *The New Laws and Rules Upon Procedure*, 9 Texas L.Rev. 538, 548 (1931); Stayton, *The Scope and Function of Pleading Under the New Federal and Texas Rules: A Comparison*, 20 Texas L.Rev. 16, 27–29 (1941); Comment, *Appeal and Error—Application of Rule 62a Since Golden v. Odiorne*, 13 Texas L.Rev. 338, 346 (1934). For a full discussion *see* Calvert, *The Development of the Doctrine of Harmless Error in Texas, supra* at 5–8.

long the argument continued, whether it was repeated or abandoned and whether there was cumulative error are proper inquiries. All of the evidence must be closely examined to determine (6) the argument's probable effect on a material finding. (7) Importantly, a reversal must come from an evaluation of the whole case, which begins with the voir dire and ends with the closing argument. The record may show that the cause is weak, strong, or very close. From all of these factors, the complainant must show that the probability that the improper argument caused harm is greater than the probability that the verdict was grounded on the proper proceedings and evidence. *Aultman v. Dallas Ry. & Term. Co.*, 152 Tex. 509, 260 S.W.2d 596 (1953). Rules 434, 503, Tex.R.Civ.P.

There was evidence in this record, partly supplied by counsel for Reese, himself, which showed the close connection between the lawyers and those treating Reese. There was no objection to the first argument about which he now complains; there was no motion to instruct as to either of the two arguments. Reese's counsel had the opportunity to reply and did so in his closing argument, and the argument was not so severe or prolonged as to amount to reversible error.

Precedents that arose prior to 1941 and hold that argument was prejudicial are unreliable, but even under the discarded rule of presumed harm, one who sat by while hearing an improper argument without objection or motion was not later heard to complain about it. *Gulf, C. & S.F. Ry. Co. v. Greenlee*, 70 Tex. 553, 8 S.W. 129, 131 (1888). A pre-1941 instance of the requirement that one promptly object and request a jury instruction to disregard the argument is *Ramirez v. Acker*, 134 Tex. 647, 138 S.W.2d 1054 (1940). In *Ramirez*, counsel argued that plaintiff's suit was one that "stinks," that plaintiff was a victim of a "scheme or design by somebody to use him," that someone ought to be indicted for filing and prosecuting the suit, that defendants were not going to pay "blood-money" in the form of a settlement as had been exacted from others. The petitioner urged that the argument left the inference that plaintiff's counsel conspired with plaintiff to bring the suit for some malicious or fraudulent purpose. *Ramirez v. Acker*, 124 S.W.2d 905, 909 (Tex.Civ.App.—Beaumont 1939), aff'd, 134 Tex. 647, 138 S.W.2d 1054 (1940). Since that argument was held curable even under the old rule of presumed harm, the brief argument in this case, to which there was no objection, *a fortiori*, was curable under the rule of harmless error. In *Wade v. Texas Employers' Ins. Ass'n*, 150 Tex. 557, 244 S.W.2d 197, 199 (1951), this court noted the strength of the rule requiring timely objection to improper argument even prior to 1941 and wrote that the supreme court had gone to some length in holding that even strong appeals to prejudice become harmless when a jury is instructed to disregard them, "for which reason it is logical to require an objection and instruction."

The injection of new and inflammatory matters into the case through argument has in exceptional instances been regarded as incurable by an instruction. An appeal to racial prejudice falls into the category. *Texas Employers Ins. Ass'n v. Haywood*, 153 Tex. 242, 266 S.W.2d 856 (1954). The use in argument of the epithets, "liar," "fraud," "faker," "cheat," and "imposter" in disregard of objections that were made was harmful. *Southwestern Greyhound Lines, Inc. v. Dickson*, 149 Tex. 599, 236 S.W.2d 115 (1951). The unsupported charge of perjury was incurable. *Howsley & Jacobs v. Kendall*, 376 S.W.2d 562 (Tex.1964). Those cases, similar to *Texas Employers' Ins. Ass'n v. McCaslin*, 159 Tex. 273, 317 S.W.2d 916 (1958), show that an affront to the court and the equality which it must portray will be dealt with harshly. However, an argument in a condemnation case that charged the condemnor with fraud was considered harmless and curable when there was no objection even when there was no support in the evidence for the argument. *City of Dallas v. Andrews*, 149 Tex. 609, 236 S.W.2d 609 (1951).

■ It is our opinion that Reese, by failing to object and press for an instruction at

the time of the argument, waived his complaint. *Turner v. Turner*, 385 S.W.2d 230 (Tex.1964); *Maston v. Texas Employer's Ins. Ass'n*, 160 Tex. 439, 331 S.W.2d 907, 910 (1960); *Texas & N.O.R. Co. v. Sturgeon*, 142 Tex. 222, 177 S.W.2d 264, 267 (1944).

In looking at the whole record, the state of the evidence, the strength and weakness of the case, and the verdict, we conclude that the jury carefully considered its verdict and the evidence. It made favorable findings for Reese on several issues. It found that Reese was injured, he suffered total incapacity for the period from March 14, 1975, to June 10, 1975, and the jury awarded him $1,239.00 for his medical, therapy and drug expenses covering that period. It denied all claims thereafter. During that period Dr. Buning charged $185.00 for his services, Morton Moriarty charged $972.00 for his therapy treatments, and drug bills amounted to $72.00 for a total of $1,229.00. The jury verdict drew a sharp line between the period during which, from the evidence, Reese did not and could not work and the time that he was able to work and did so.

The probabilities are that the jury would have reached its same conclusion from the evidence without regard to Standard's argument. This is the evidence from the whole record. Two physicians released Reese to return to work. There was a long gap between the time Reese stopped seeing any doctor and when he returned. He did not see Dr. Buning from May 29 to January 5. He did not see Dr. Bachynsky from June, 1976, to November. Mr. Moriarty's therapy treatments ceased during the period from June 9, 1975, to January 5, 1976. Reese went to see Dr. Bachynsky in March, 1976. It was Dr. Bachynsky, Reese's doctor, who testified that all of Reese's symptoms were only subjectively supported. It was Dr. Bachynsky who said that the therapy treatments that Dr. Buning prescribed were not beneficial and also that he never prescribed them. The jury accepted that judgment of Mr. Reese's doctor by denying the claimed medical and therapy expenses incurred after June 9, 1976, the end of the total incapacity period. Reese testified that he went back to full-time work in four or five months after his injury. He said that he worked until each job was finished, returned to his union for the next assignment, was never discharged, and earned wages as a cement worker in excess of any prior time during his life. The probabilities are that the jury believed this testimony of Reese and his own doctor and that the jury rendered a careful verdict upon the basis of the evidence.

The judgment of the court of civil appeals is reversed and that of the trial court is affirmed.

STEAKLEY, Justice, dissenting.

I am dismayed by the action of the Court in reversing the judgment of the Court of Civil Appeals by means of the holding that the jury argument here in question "was neither improper nor reversibly harmful." We ought to confront more positively the particular seriousness in jury argument of attacks upon the professional ethics and integrity of opposing counsel.

In my view, and as held by the unanimous Court of Civil Appeals, 567 S.W.2d 861, the jury arguments were improper, without support in the evidence and by their very nature incurable. There can hardly be an accusation of more severity and seriousness than the charge that opposing counsel participated in a plot and joined in a combination with two medical doctors to manufacture medical testimony and to provide medical treatment not needed so as to impress a jury with inflated medical charges. Such conduct is calculated to prejudice the jury against the case of the client of the lawyer so charged, and of the medical witnesses presented in his behalf; furthermore, such accusations without foundation in the record magnify the all too prevalent and unjustified cynicism of the lay public with respect to the legal profession. It is a violation of legal ethics to make unfair or derogatory personal reference to opposing counsel. See also The Code of Professional Responsibility promulgated by this Court, governing the conduct of attorneys. In my view, the prejudice and harm

to Reese from the jury arguments under review could not have been removed by withdrawal of the charges or by admonition of the court. But here the trial court in responding to an objection upon repetition of the accusation of a lawyer doctor "combination" said only that the accused counsel could reply in his closing argument.

I disagree with the supporting statement in the majority opinion that "there was direct evidence, as well as inferences from the evidence, which supported the argument." From my examination of the record, there is a complete absence of any direct evidence of a "sham or plot," or of a Mafrige [the lawyer]-Bachynsky [the doctor]-Buning [another doctor] combination"; or that Reese "drove by a thousand doctors" in reaching the office of Dr. Buning. Indeed, Standard does not claim otherwise in its Application for Writ. But it asserts there was evidence permitting the inference that Dr. Buning was interested only in helping build a case that Reese had suffered a back injury; and that this was at the request of counsel for Reese. I find no evidence in the record to support these claimed inferences. Nor can proof of the fact, if such is a fact, that Reese in going to the office of Dr. Buning drove by a thousand doctors, be supplied, as argued by Standard, as a matter of common knowledge "to any Harris County juror."

I read the erudite majority as suggesting that hyperbole overrides the absence of supporting evidence. The precedential or supportable value of the writings upon which the majority relies would seem questionable, i. e., Shakespeare, John Milton, Alexander Pope, Robert Burns, William Wordsworth, Isaac Watts, Lord Byron, Thomas Percy, Samuel Taylor Coleridge, Alfred Lord Tennyson, Henry David Thoreau, John Ruskin, John Davidson, and Rudyard Kipling. I suggest our own writings are more in point.

In *Gulf, C. & S.F. Ry. Co. v. Greenlee,* 70 Tex. 553, 8 S.W. 129 (1888), this Court spoke in terms of whether the remarks to the jury were so plainly prejudicial to the other party as to demand that the verdict be set aside. Citing *Greenlee,* it was said in *Wade v. Texas Employers' Insurance Association,* 150 Tex. 557, 244 S.W.2d 197 (1951), that we judge by the degree of the vice, not merely the subject matter of the argument, and that the distinction between arguments that are "curable" and those that are not has always been one of difficult application. We stated in *Texas Employers' Insurance Association v. Haywood,* 153 Tex. 242, 266 S.W.2d 856 (1954), that the true test is the degree of prejudice flowing from the argument, i. e., whether the argument, considered in its proper setting, was reasonably calculated to cause such prejudice to the opposing litigant that a withdrawal by counsel or an instruction by the court, or both, could not eliminate the probability that it resulted in an improper verdict. In addition, the Court noted that "We realize that in the course of a hotly contested trial lawyers are apt, even prone, to 'pull off the gloves'; *but lawyers are officers of the court and proper and ethical conduct requires that there be limitations on the extent to which counsel may go in the injection of prejudicial and inadmissible matters, whether by way of cross-examination of witnesses or by way of jury argument."* 266 S.W.2d at 859, (My italics).

This Court has heretofore considered jury arguments of an accusatory nature against opposing counsel similar to those under review here. It was recited in *Lumbermen's Lloyds v. Loper,* 153 Tex. 404, 269 S.W.2d 367 (1954), that counsel for one party in effect accused counsel for the other party of suborning false testimony on the part of a medical witness; that while the accusation was not in the most positive or provocative words, the import was quite plain and was an unfair deduction from the record. It was assumed in *Loper, supra,* that the arguments were improper and of the type that ordinarily is incurable by admonition from the Bench. Notwithstanding, it was concluded from an examination of the whole record that the jury would in all probability have rendered the same verdict, whatever the nature of the jury argument.

In *Cross v. Houston Belt & Terminal Railway Co.*, 351 S.W.2d 84 (Tex.Civ.App. 1961, writ ref'd n. r. e.), it was charged in jury argument that the party suing for personal injuries allegedly sustained by him while engaged in work "placed himself in the hands of these attorneys who had every reason in the world from their financial interest in this case to do everything that they can to hoodwink this Jury from the time that they went shopping for doctors and they have been trying to put in twisted evidence . . . ." Upon objection to the argument the Court said, "Counsel I think you can draw emphasis from the testimony." The initial counsel thereupon continued the argument by charging that " . . . [W]hen he hired these attorneys it was just a question of manufacturing testimony, and they went out and hire any witnesses they can get to say things that you have heard from this witness stand here . . . ." The Court of Civil Appeals found nothing in the record to justify the argument and it was ruled improper, inflammatory and prejudicial in imputing perjury to the witnesses and subornation of perjury to counsel; and, further, that the argument was incurable and in the light of the jury finding could scarcely have done other than result in harm. We did not disturb this writing in acting on the Application for Writ of Error. See also *Southern Pacific Company v. Hubbard*, 156 Tex. 525, 297 S.W.2d 120 (1956); *Texas Employers' Insurance Assoc. v. Butler*, 287 S.W.2d 198 (Tex.Civ.App.1956, writ ref'd n. r. e.); *Stephens v. Smith*, 208 S.W.2d 689 (Tex.Civ. App.1948, writ ref'd n. r. e.).

It is apparent to me that the arguments here in question probably resulted in an improper verdict; and that the self-serving dissertation of the majority on the harmless error rule is pointless. Reese received an injury while at work on or about March 14, 1975. Reese and his wife testified that this did in fact occur; but there is also evidence upon the basis of which a contrary finding could have been made. The finding by the jury of the fact of injury rested principally, if not entirely, upon the testimony of Reese and his wife, both of whom the jury obviously believed as to this. The jury further found, however, that the injury was the producing cause of total incapacity for the brief period from March 14, 1975 to June 10, 1975; and that the injury was not a producing cause of any partial incapacity. The testimony of Reese and his wife was to the effect that the incapacity suffered by Reese as a result of the injury had not lessened; and that his symptoms of pain and inability to engage in work affecting his back had not abated. The medical witness on behalf of Reese was asked the question, "Doctor, I am going to ask you if you can, based on reasonable medical probability, to give an opinion as to a percentage of disability in your opinion that Mr. Reese is suffering from which would be in most reasonable medical probability a projection of his current and future disability." The answer to this question was, "I think based on that question and based on the type of work that he was doing prior to his injury I would say that he has lost, or he is not able to do approximately sixty percent of the work that he was able to do before this." There was no other medical witness. Notwithstanding the testimony of Reese and his wife, and of their medical witness, the jury in its verdict said that the incapacity of Reese continued only for a period of approximately three months, and that he had not suffered any partial incapacity thereafter. There was no testimony addressing a specific period of time of total incapacity, and there is no explanation of why the jury believed Reese and his wife as to the fact of injury, but did not believe them, or their doctor, as to the duration of the resulting incapacity.

Also, as previously noted, the jury found that Reese had expended or incurred the sum of $1,239 as reasonably required medical care. This was notwithstanding the proof that the charges incurred for physical therapy were in the sum of $1,458 and the charges incurred as doctors' fees were in the sum of $255, or for a total of $1,713. There is no direct evidence in the record challenging these medical charges and it is reasonable to conclude that the jury was

probably influenced in the reduction of $474 by the accusation in the jury arguments that there was a "sham or a plot" to "build those medical bills up real high. The higher the medical bills, obviously he has got to be hurt if he has got all of those medical bills. It will look good in front of a jury."

I would affirm the judgment of the Court of Civil Appeals.

SAM D. JOHNSON, J., joins in this dissent.