Opinion issued August 2, 2007












 







In The

Court of Appeals

For The

First District of Texas






NO. 01-04-00566-CV

 __________


R. C. JONES, SUPERIOR WASTE MANAGEMENT SERVICES, INC.
AND JTI CONTRACTORS, INC., Appellants


V.


REPUBLIC WASTE SERVICES OF TEXAS, LTD. AND 

RUSTIN TRANSPORTATION COMPANY, L.P., Appellees






On Appeal from the 295th District Court

Harris County, Texas

Trial Court Cause No. 2001-59389






DISSENTING OPINION

 The trial court expressly found that trial counsel for appellee, Rustin
Transportation Company, L.P. ("Rustin"), in her jury argument, "completely
concocted" facts and implied that trial counsel for appellants, R. C. Jones, Superior
Waste Management Services, Inc. ("Superior"), and JTI Contractors, Inc. ("JTI"),
"suborned perjury." The trial court further found the argument, based on a "made-up
conversation," to be "improper" and "inflammatory."

 Although the majority agrees that the accusations of suborning perjury were
"reprehensible," it concludes, in violation of Texas Supreme Court precedent, that the
"improper, inflammatory" jury argument was "curable" and that by failing "to object,
request an instruction to disregard, and request a motion for mistrial," appellants
waived any error for our review. It compounds this error by actually suggesting,
without any authority, that appellants should have requested specific instructions to
cure the false allegations of suborned perjury. The majority further errs in holding
alternatively that the trial court did not err in denying appellants' motion for new trial. 
It reaches this result by conducting a conclusory harm analysis, merely quoting the
trial court's finding that the jury's verdict was probably grounded on proper evidence.

 Under the majority's analysis, virtually any "reprehensible" and "improper,
inflammatory" jury argument could be cured. The majority's error will serve to
encourage more such arguments and is, thus, of such importance to the State's
jurisprudence that it should be corrected. Accordingly, I respectfully dissent.


Background

 Appellants sued Republic Waste Services of Texas, Ltd. ("Republic") and
Rustin for breach of contract and fraud. The City of Houston, pursuant to its
Minority and Women Business Enterprises Program ("MWBE"), requires City
contractors to sign "Letter of Intent" agreements with minority-owned subcontractors
and to submit the agreements and a MWBE participation plan to the City when
bidding on certain city contracts. Republic obtained a 20-year waste disposal contract
with the City for a bid amount of $295 million, and it subcontracted with Rustin for
transfer station loading and hauling of waste. Jones, an African-American who owns
Superior, and Jesse Valeriano, a Hispanic who owns JTI, signed Letters of Intent,
agreeing to haul waste to Republic's landfill. 

 Appellants alleged that Republic breached the agreements, "which granted
Superior and JTI each 10% participation" as minority-owned subcontractors in
Republic's 20-year waste disposal contract with the City. Appellants also alleged that
both Republic and Rustin "never intended for Superior and JTI to participate in 10%
of the [City] Contract" and that Rustin breached its subcontracts with them by failing
to pay them annual consumer price index ("CPI") rate adjustments.

 Superior and JTI each signed three hauling subcontracts with Rustin. The
"intent of the parties" regarding the payment of CPI increases was hotly contested. 
Appellants presented evidence that their subcontracts with Rustin should have been
read together with Republic's contract with the City to ascertain the parties' intent
about CPI rate adjustments, i.e., that the rates be adjusted "[b]eginning July 1, 2001
and each subsequent July 1, thereafter." Rustin presented evidence that Superior and
JTI were to receive rate increases only when Rustin received a rate increase. 

 At the conclusion of a three-week long trial, the trial court submitted the case
to the jury on issues as to whether the parties actually reached certain agreements,
whether Republic failed to comply with them, whether Republic committed fraud, and
whether Rustin was part of a conspiracy to commit fraud. In the issues concerning
the contracts between appellants and Rustin, the trial court instructed the jury to
interpret the meaning of the language in the signed agreements. (1) The trial court
concluded that the pertinent contracts were ambiguous and that the jury had to
determine the intent of the parties. (2) In an eleven to one verdict, the jury answered all
of the liability questions against appellants.

The "Reprehensible" and "Improper, Inflammatory Jury Argument" 

 From the outset, the pervading theme of the jury argument of Rustin's trial
counsel, Jennifer House, was that "this case is a lawyer's construct, it is created by
lawyers." (Emphasis added.) After noting that, because of the trial, she did not have
time to put away her Christmas ornaments, House lamented, "There is something
very, very wrong with what has happened in this case. There is something wrong
about an individual who has fought for his country, been wounded three times, to be
accused of fraud in the operation of his business, to benefit people who don't want to
work and who are expecting a windfall." (Emphasis added.)

 After discussing some of the fraud allegations and some of the evidence in
favor of her client, House launched, full force, into her attack on opposing counsel,
John Able, and appellants' case:

 [Ms. House]: . . . . I am proud to be a lawyer. I take no pride in accusing other lawyers of wrongdoing, but I cannot
help but have difficulty with the fact that Rustin
never made representations to these minority
subcontractors that they were going to be entitled to
overall 20 percent participation of $295 million.


 . . . .


 Mr. Jones . . . was going to punish these companies
every step of the way because he believed that there
wouldn't be 12 of you in this box smart enough to
understand what happened. But you are smart
enough. . . .


 And when [Valeriano] testified in October of 2002
that he was operating profitably from Westpark and
Lawndale, he was telling the truth. 


 Why did the story change, then? Why did the story
change? Because he met Mr. Able and Mr. Able
said, "Jesse, by the way, did you know under our
theory you are entitled to $5 million of profit over
20 years?"


 [Mr. Able]: Objection, Your Honor. There is no evidence that I
told him anything.


 [Trial Court]: Sustained.


After the trial court sustained Able's objection, House, without skipping a beat,
continued: 

 [Ms. House]: Suddenly--and you heard the testimony. Mr. Able
questioned him, and the testimony was he met with
Mr. Able after his deposition. Do you know who
else he met with? The gentleman sitting in this
corner right here, Greg Brown, CPA.


 Now it is interesting. . . . [Valeriano] needs a new
CPA and--he needs a new attorney, Mr. Able, and
a new CPA. And suddenly the entire story changes.
And suddenly in February of 2003, a couple of
months later, he is a party to this lawsuit. 


 . . . .


 And I will tell you why he is a party to this lawsuit. 
Because the couple of hundred thousand dollars that
he was going to make or was making with Rustin,
vis-a-vis the existing work that he was doing, in his
mind was peanuts compared to the $5 million that
he was going to ask you for under the trumped up
claim that he was entitled to 10 percent of $295
million over 20 years. And that's why the story
changed, and that's why we are here.


(Emphasis added.)

 In comparing the credibility of Jim Goodyear, a Rustin witness, with that of
Valeriano, House noted that when Goodyear met with Valeriano, Valeriano did not
ask for "10 percent of $295 million." She stated,

 [Ms. House]: He never said that. It is a construct. That idea
happened later. It didn't happen in the beginning. 
It wasn't part of the negotiations. It happened later. 
It was an idea that occurred, I submit, with the
participation of lawyers and accountants.


(Emphasis added.) 


 In summing up for the jury, House emphasized, "Ladies and gentlemen of the
jury, everything I have told you and argued to you in these brief moments is
supported by these written documents, not a construct of mine at all." (Emphasis
added.) 

 House's theme, from start to finish, was that appellants' case, based on
suborned perjury, was "a lawyer's construct," a "trumped up claim" of their "lawyers
and accountants." In complete contrast, Rustin's defense was "not a construct . . . at
all." Thus, the trial court's and the majority's findings that the improper and
inflammatory argument was "short in duration" and was "not repeated" are patently
wrong. 

 In their new trial motion, appellants asserted that House's improper argument
caused them incurable harm. See Tex. R. Civ. P. 324(b)(5). The trial court, in its
order denying the motion, stated that it did not believe that the jury's verdict was "the
result of the improper, inflammatory jury argument made by Jennifer House." 
(Emphasis added.) Nevertheless, the trial court went on to note,

 But let there be no doubt that the argument was improper. And
although Ms. House in oral argument stated that she "was stunned by the
seriousness with which the Court regarded the allegations," the denial
of the new trial does not mean that the court condones this type of
argument. Attacks on opposing counsel are error. . . .


 In Ms. House's argument she completely concocted a
conversation between the plaintiff's counsel, Mr. Able, and the plaintiff,
Mr. Valeriano, and implied that Mr. Able suborned perjury. Ms. House
stated in closing argument "Why did the story change, then? Why did
the story change? Because he met Mr. Able and Mr. Able said, "Jesse,
by the way, did you know under our theory you are entitled to $5 million
of profit over 20 years?" 

 

 What is most disturbing is Ms. House's attempt to explain away
this made-up conversation. In her brief and in her oral argument before
the court she attempted to justify her statement, claiming it was based on
questions asked by Mr. Able in a deposition. The court has reviewed
the entire deposition of Mr. Valeriano and there is no reference to such
a question or statement or meeting. And most certainly there was no
evidence before the jury of such a question or statement or meeting. 
Ms. House continues her misstatements in her briefing. At page 5 of her
brief, Ms. House says, "each and every questioned statement made by
Ms. House is in the record and is based in fact." There is absolutely no
evidence in the record of such a meeting or such a statement.


 At oral argument, realizing that the court was skeptical that
questions [that] were asked in a deposition would be considered a
meeting, Ms. House then argues that Mr. Able and Mr. Valeriano must
have met to form the attorney client relationship and that such a meeting
could be inferred from the fact that Mr. Valeriano became Mr. Able's
client. While undoubtedly there were many meetings between Mr. Able
and Mr. Valeriano, (although of course there is no evidence in the record
of such meetings) what Ms. House fabricated was the content of such a
meeting and the implication that Mr. Able suborned perjury and induced
Mr. Valeriano to change his story.

(Citations omitted) (emphasis added).

Incurable Harm = Reversible Harm In their first issue, appellants argue that the trial court erred in denying their
new trial motion because trial counsel for Rustin falsely accused their counsel of
"suborning perjury, thereby violating the most basic tenets of fundamental fairness
and rendering the proceedings patently unfair." They assert that, given the
seriousness of House's unsupported allegations of perjury, damage to their case
should be presumed as a matter of law. In fact, how can such a "reprehensible" and
"improper, inflammatory jury argument," not be harmful to a litigant's case? 

 In cases involving improper jury argument, an appellant must show "a number
of things." Standard Fire Ins. Co. v. Reese, 584 S.W.2d 835, 839 (Tex. 1979). As
noted by the Texas Supreme Court in Reese, generally,

 He has the burden to prove (1) an error (2) that was not invited or
provoked, (3) that was preserved by the proper trial predicate, such as
an objection, a motion to instruct, or a motion for mistrial, and (4) was
not curable by an instruction, a prompt withdrawal of the statement, or
a reprimand by the judge. . . . There are only rare instances of incurable
harm from improper argument. The complainant has the further burden
to prove (5) that the argument by its nature, degree and extent
constituted reversibly harmful error. How long the argument continued,
whether it was repeated or abandoned and whether there was cumulative
error are proper inquiries. All of the evidence must be closely examined
to determine (6) the argument's probable effect on a material finding. 
(7) Importantly, a reversal must come from an evaluation of the whole
case, which begins with the voir dire and ends with the closing
argument. The record may show that the cause is weak, strong, or very
close. From all of these factors, the complainant must show that the
probability that the improper argument caused harm is greater than the
probability that the verdict was grounded on the proper proceedings and
evidence. 


Id. at 839-40 (citations omitted) (emphasis added). This language has been described
as "unusually broad," "remarkable," and "confusing." Roger D. Townsend, Improper
Jury Argument and Professionalism: Rethinking Standard Fire v. Reese, 67 Tex. B.
J. 448, 449-50 (June 2004). However, after stating the above, the supreme court
clarified:

 The injection of new and inflammatory matters into the case through
argument has in exceptional instances been regarded as incurable by an
instruction. An appeal to racial prejudice falls into the category. . . . The
use in argument of the epithets, "liar," "fraud," "faker," "cheat," and
"imposter" in disregard of objections that were made was harmful. . . .
The unsupported charge of perjury was incurable. . . . Those cases . . .
show that an affront to the court and the equality which it must portray
will be dealt with harshly.


Reese, 584 S.W.2d at 840 (citations omitted) (emphasis added).

 As noted by then Justice David Peeples in Texas Employers' Insurance
Association v. Guerrero, "Clearly an incurable argument does not require an
objection, but to go further and hold that an argument can be incurable and yet
harmless is a contradiction in terms." 800 S.W.2d 859, 863 (Tex. App.--San Antonio
1990, writ denied). Thus, the court held that "incurable does not mean simply that
no objection need be made; it also means that the argument's harmfulness, its
reversible impact, cannot be cured or corrected by an instruction." Id. at 864
(emphasis added). As previously explained by the supreme court,

 Improper jury arguments are usually referred to as one of two types:
"curable" or "incurable." A jury argument is "curable" when the
harmful effect of the argument can be eliminated by a trial judge's
instruction to the jury to disregard what they have just heard. The error
is "cured" and rendered harmless by the instruction. On the other hand,
an argument may be so inflammatory that its harmfulness could not be
eliminated by an instruction to the jury to disregard it. The prejudicial
nature of the argument is so acute that it is "incurable." 


 Otis Elevator Co. v. Wood, 436 S.W.2d 324, 333 (Tex. 1968) (emphasis added). 

 In Howsley & Jacobs v. Kendall, a plaintiff's lawyer argued to the jury that
"[s]omebody was testifying through the lips of" a critical witness and that witness
testified "under the coaching of this battery of lawyers." 376 S.W.2d 562, 565-66
(Tex. 1964). The Texas Supreme Court concluded that "[a]n assertion of facts having
no evidentiary basis were placed before the jury and these asserted facts were in turn
made the basis of an inflammatory appeal." Id. at 566. It therefore held that "[n]o
instruction of the trial judge could have removed the prejudicial effects of the
argument and hence no objection was necessary to preserve the error." Id. Why? 
Because the prejudicial harm from such an inflammatory argument is readily
apparent:

 It is our opinion that from the time the charge was made that someone
else was testifying though the lips of [the witness], coupled with the
statement as to a 'battery of lawyers,' the [defendant]'s case was
irretrievably prejudiced.


Id. (emphasis added). 

 Likewise, here, "from the time" that the unsupported allegation of suborned
perjury "was made," appellants' case was "irretrievably prejudiced." Contrary to the
majority's representation that "the issue of the changed testimony . . . went to
appellants' theory of damages," Ms. House did not so limit her improper argument. 
She characterized appellants' entire case as a lawyer's construct, based on suborned
perjury. Although on point and controlling, the majority merely mentions Howsley
& Jacobs in a parenthetical. Ignoring the supreme court's holding that "no
instruction" could remove the prejudicial effects of such "an inflammatory appeal," 
the majority compounds its error by crafting its own instructions to cure the
"perceived prejudicial effect" of House's comments. In fact, instructing the jury that
"it was improper for House to impute wrongdoing of any kind to appellants' counsel"
and that "any further argument along such line would result in a mistrial," would, as
illustrated in Howsley & Jacobs, have done nothing to remove the prejudicial effects
of the inflammatory argument. 

 This case, involving allegations of breach of contract and fraud, like most cases
actually tried to a jury, boiled down to the credibility of the witnesses. The jury was
asked to decide whether the parties had actually reached certain agreements, to
interpret the agreements to ascertain the intent of the parties, to decide whether the
defendants breached any agreements, and to determine whether the defendants
engaged in fraud. The credibility of appellants was obviously critical in deciding
these issues, especially in light of the fact that the jury was asked to determine
whether the parties had actually reached certain agreements and the intent of the
parties about their agreements. There can be no doubt but that a juror, even after
receiving the majority's proposed instructions, would place considerable weight on
House's inflammatory comments. How could a juror not be influenced by her
assertion that appellants' entire case was a "trumped up" "construct" of lawyers and
accountants based on suborned perjury? 

 Given that the pervading theme of Rustin's jury argument was that appellants'
entire case "is a lawyer's construct, it is created by lawyers," and Rustin's case was
not, the trial court's and the majority's findings that the inflammatory argument was
"short in duration" and was "not repeated" are objectively and clearly erroneous. 
However, the record does reveal, as found by the trial court, that House "concocted"
her argument that Abel suborned perjury. (3) There is no evidence in the record
supporting an inference that Able met with Valeriano and suborned perjury and
"trumped up" a claim. The argument was neither invited nor provoked, and it
injected the new, inflammatory, and unsupported charge of suborned perjury into the
case. Calculated to cause the rendition of an improper judgment, the inflammatory
argument called into question the ultimate integrity of the fact-finding process and
was particularly egregious. 

 The "improper, inflammatory jury argument," along with House's assertions
that appellants' entire case was a "trumped up claim" and a "construct" of their
"lawyers and accountants," irretrievably prejudiced appellants' case. See Howsley &
Jacobs, 376 S.W.2d at 566. Thus, the argument's harmfulness, i.e., its "reversible
impact," could not be cured. Guerrero, 800 S.W.2d at 864. Indeed, this Court has
previously explained that a similar charge "by [an] appellee's counsel to the effect
that [an] appellant's entire case was based upon perjury and manufactured testimony,
to which his counsel was a party, could scarcely have done other than result in harm." 
Cross v. Houston Belt & Terminal Ry. Co., 351 S.W.2d 84, 87 (Tex. Civ.
App.--Houston 1961, writ ref'd n.r.e.). (4) Accordingly, the majority seriously errs in
concluding that Ms. House's "reprehensible" comments "were curable" and holding
that appellants "waived this error." Likewise, it errs in concluding, alternatively, that
her "improper, inflammatory" jury argument did not harm appellants' case.

Conclusion

 I would hold that the "reprehensible" and "improper, inflammatory jury
argument" made by Rustin's trial counsel was incurable and thus, that it probably
caused the rendition of an improper judgment. See Tex. R. App. P. 44.1(a)(1). I
would further hold that the trial court abused its discretion in denying appellants'
motion for new trial. Accordingly, I would sustain appellants' first issue, reverse the
judgment of the trial court, and remand the case for a new trial. 

 The majority's decision to the contrary is in serious error. The majority's
opinion, based on its interpretation of Reese, will actually encourage more such
improper arguments, "for what is permitted is considered proper." Roger D.
Townsend, 67 Tex. B. J. at 454. If appellate courts are inclined to find such an
"improper, inflammatory jury argument" to actually be curable, why not "take the
gloves off," engage in such inflammatory displays, and bias and prejudice the jury
against your opponent? See id. Importantly, although such "improper arguments
work," they take a great toll on the public's perceptions of lawyers and our jury trial
system. Id. at 453. Improper arguments confirm for real jurors in real Texas
courtrooms the worst caricatures of lawyers and our justice system that television and
movies have to offer.

 Ultimately, trial judges have the duty to enforce "law and order, as well as
dignity, in their courtrooms." Id. at 454. Indeed, trial courts need not "wait for
objections to be made when the rules as to arguments are violated." Tex. R. Civ. P.
269(g). "Mere personal criticism by counsel upon each other" in argument "shall be
promptly corrected as a contempt of court." Tex. R. Civ. P. 269(e). Appellate
justices also have important duties as illustrated by this case. As noted by Townsend,

 When [judges] abdicate [their] duty, professionalism suffers even more
than when a lawyer makes an improper argument, for what is permitted
is considered proper by the jury. All judges who do not stop improper
arguments--and all trial lawyers who make improper arguments--have
no business lamenting the public's low perception of lawyers. They
need only look in the mirror.


Roger D. Townsend, 67 Tex. B. J. at 454 (emphasis added). 


 

 




 Terry Jennings

 Justice


Panel consists of Justices Jennings, Hanks, and Higley.

Justice Jennings, dissenting.
1. For example, the trial court submitted question 9 as follows:


 Did Rustin fail to comply with the contracts between Superior and
Rustin in payment of CPI increases?


 It is your duty to interpret the following language of the signed
agreements between Rustin and Superior:


 "The transportation rate for the applicable Contract Year
shall be adjusted . . . ."


 You must decide its meaning by determining the intent of the parties at
the time of the agreement. Consider all the facts and circumstances
surrounding the making of the agreement, the interpretation placed on
the agreement by the parties, and the conduct of the parties.
2. See J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 (Tex. 2003). 
3. A person commits the third degree felony offense of aggravated perjury if he makes
a false, material statement under oath during or in connection with an official
proceeding. Tex. Pen. Code Ann. § 37.03 (Vernon 2003). 
4. It should be noted that some courts have concluded that "incurable harm" from a jury
argument does not necessarily equate to "reversible harm." See Manon v. Solis, 142
S.W.3d 380, 391 n.6 (Tex. App.--Houston [14th Dist.] 2004, pet. denied). However,
this Court, in a criminal case, has previously noted the incongruity of determining
whether an "incurable" improper jury argument is "harmful" or "harmless." 
Thompson v. State, 89 S.W.3d 843, 853 (Tex. App.--Houston [1st Dist.] 2002, pet.
ref'd). After all, "incurable" is defined as "[n]ot admitting of remedy, correction, or
reformation." The Compact Oxford English Dictionary 835 (2d ed. 1991). 
Nevertheless, controlling authority in criminal cases actually requires a harmless error
analysis even when an appellate court concludes that an improper argument is
"incurable." Thompson, 89 S.W.3d at 853.

 

 In contrast, as pointed out in Guerrero, controlling authority in civil cases recognizes
that in certain instances, although rare, a harmless error analysis need not be
performed when the harm from an improper argument is "incurable." 800 S.W.2d at
864. The court, in Guerrero, emphasized that the supreme court, in Reese, equated
the term "incurable" with "harmful." Id. The "notion of 'cure' refers to removing
the argument's harmful effect." Id. The supreme court has specifically recognized
that appeals to racial prejudice and "unsupported charge[s] of perjury" are 
"incurable." Reese, 584 S.W.2d at 840.