**TEXAS HEALTH ENTERPRISES, INC., d/b/a Sun Valley Health Care Center, Appellant,**

v.

**Judith Marie KRELL, Appellee.**

No. 13–91–288–CV.

Court of Appeals of Texas, Corpus Christi.

March 19, 1992.

Rehearing Overruled April 30, 1992.

Dan S. Boyd, Stephen Carlin, Johnson & Gibbs, Dallas, Frank E. Weathered, Dunn, Cason & Weathered, Corpus Christi, for appellant.

Frank Costilla, Carter C. White, Ed Stapleton, Costilla & Stapleton, Brownsville, for appellee.

Before BISSETT,[1] SEERDEN and HINOJOSA, JJ.

## OPINION

BISSETT, Justice (Assigned).

This appeal arises from a common-law action brought by Judith Marie Krell ("Mrs. Krell") against Texas Health Enterprises, Inc., d/b/a Sun Valley Health Care Center ("Texas Health") to recover damages for personal injuries sustained while she was working for Texas Health, which was not a subscriber to Worker's Compensation Insurance.

The case was tried to a jury which found that Texas Health's negligence proximately caused the incident in which Mrs. Krell was injured. The jury awarded Mrs. Krell actual damages in the amount of $823,835 and exemplary damages in the amount of $500,000. Texas Health's motions for judgment notwithstanding the verdict and for new trial were overruled. We affirm the trial court's judgment.

Mrs. Krell alleged that on October 23, 1989, while in the course and scope of her employment as a nurse's aide at Texas Health Sun Valley Care Center, in Harlingen, Texas, she slipped and fell in a puddle of water which had accumulated in the Center's A-wing hallway floor where she was required to walk. She claimed that the water accumulated due to leakage or overcondensation from a ceiling air conditioning unit and presented a hazardous work condition and a danger to anyone who might walk through the hallway. The pleadings state that she was unaware of the dangerous nature of the condition created on the floor, and that she suffered serious and disabling injuries to her back and other parts of her body when she fell.

Mrs. Krell further alleged that Texas Health was negligent in 1) creating an unreasonably dangerous condition on the floor, 2) allowing an unreasonably dangerous condition to exist on the floor, 3) failing to adequately maintain the hallway in a clean fashion, free of water on the floor, 4) failing to place visible floor stand signs or other warning to identify the unreasonably dangerous condition on the floor, 5) failing to repair the leaking air conditioning unit, 6) recklessly and knowingly failing to repair the leaking air conditioning unit, 7) failing to adequately inspect and perform preventive maintenance on the air conditioning unit, 8) recklessly and knowingly failing to adequately inspect and perform preventive maintenance on the air conditioning unit, 9) failing to clean up the water coming from the washroom where dirty linen was rinsed, and 10) failing to provide a safe place to work.

On the morning of her injury, Mrs. Krell had just finished shaving a patient, and had left the room to get a towel off a linen cart to wipe off the patient's face. When returning to the patient's room, she slipped in a puddle of water which had accumulated on the floor. She described the actual fall as occurring when her right foot flew out from underneath her, causing her to land on her left knee. She felt a "real bad twisting and popping." She did not "feel a great deal of pain right away," but that within a short time she knew "something was wrong."

---

Gov't Code Ann. § 74.003 (Vernon 1988).

Mrs. Krell testified that she had seen water in that location before on several occasions, and that she had previously reported it to housekeeping. She stated that the water was leaking from an air conditioning duct in the ceiling, that she had seen water "pouring out of the vent," and that she also reported the leak to Rene Garcia, the maintenance supervisor, one or two weeks before the accident. She further testified that Garcia told her he would do something about it, but he did not fix the leak.

Texas Health presents sixteen points of error. It contends in its first and second points that the trial court erred in submitting its definition of negligence in its charge to the jury and in refusing to submit Texas Health's requested definition of negligence.

### REQUESTED DEFINITION

Counsel for Texas Health filed with the district clerk prior to the submission of the charge to the jury, a written request that the following question and definitions be submitted to the jury:

QUESTION NO. 1:

Do you find from a preponderance of the evidence that the negligence, if any, of Texas Health was a proximate cause of the injuries sustained by Judith Krell? "Negligence" with regards to Texas Health means either (1) the failure to use ordinary care to reduce or eliminate an unreasonable risk of harm created by a premises condition which the owner or occupier knows about or in the exercise of ordinary care should have known about, or (2) the failure to provide a reasonably safe place to work.

"An unreasonable risk of harm" is one in which there is a sufficient probability of a harmful event occurring that an ordinary prudent person would have foreseen that it or some similar event is likely to happen.

Answer "Yes" or "No."

The trial court submitted the following question on the issue of liability in its charge to the jury:

QUESTION 1

Was the negligence, if any, of Texas Health a proximate cause of the occurrence in question?

The jury answered "yes."

The trial court defined the word "negligence" in the general instructions and definitions set out in its charge to the jury as follows:

"NEGLIGENCE" with reference to the conduct of Texas Health means the failure to use ordinary care of the employees of Texas Health other than Mrs. Krell; that is to say, failure to do that which a person of ordinary prudence would have done under the same or similar circumstances, or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.

With respect to the charge given by the trial court, the statement of facts reveal the following objections made by counsel for Texas Health and the court's comments and rulings:

Counsel: Your Honor, in the Corbin charge we would object to the definition of negligence. It's not incorrect statements of the law, Your Honor, but when it's used in conjunction with Issue No. 1—

The Court: Well, we're not going on the Corbin now. The plaintiff doesn't want it.

Counsel: If I may have just a moment, Your Honor.

Our first objection, Your Honor, to the charge the Court will use is there is a variance between the pleadings and the proof. The pleadings here involve premises liability and the failure to maintain a reasonably safe place to work. In the charge, Your Honor, in regards to Question No. 1, the jury could find negligence without the requisite definitions involving failure to maintain a safe place to work and the conditions which caused an unreasonable risk of harm, and also, that we knew or should have known about the unreasonable risk of harm. We object, Your Honor, to the extent that this is a

direct comment on the weight of the evidence.

In regards to Question No. 1, I would further object in that it fails to contain all the material elements of the claims of the plaintiff.

\* \* \* \* \* \*

In addition to these objections, Your Honor, we have submitted our proposed charges to the Court. We would ask that those be used by the Court, Your Honor.

THE COURT: Objections be overruled. Requests for issues, except for those given, will be denied.

Mrs. Krell contends that Texas Health failed to preserve error to the definition of negligence submitted by the trial court, and asserts that the objection stated by Texas Health is not the same as that which it now raises on appeal. The first point of error reads:

> The trial court erred in submitting its definition of negligence; in refusing to submit THE'S (Texas Health's) requested definition of negligence; in rendering judgment; and in overruling the motion for judgment n.o.v. because negligence was erroneously defined.

The second point of error reads:

> The trial court erred in overruling the motion for new trial because negligence was erroneously defined.

This Court stated in *Wright Way Constr. Co. v. Harlingen Mall Co.*, 799 S.W.2d 415, 419 (Tex.App.—Corpus Christi 1990, writ denied) that, with respect to the refusal to submit a requested instruction, the appellant must 1) tender in writing a requested instruction prior to submission, 2) make a specific objection to the refusal to incorporate the requested instruction in the charge, and 3) secure a ruling from the court.

■ In the instant case, the record does not show that the requested definition of "negligence" was ever presented to the trial court for a ruling thereon, nor does the record show that the trial judge endorsed it "refused," or signed it officially. *See* Tex.R.Civ.P. 276, which states that upon presentment of a requested definition, (and the trial court refuses the same) the trial judge "shall endorse thereon "Refused," and sign the same officially." According to the statement of facts, counsel for appellant, in his objection to the charge, did not specifically refer to the requested definition of the word negligence, and while counsel did tell the court "we have submitted our proposed *charges* to the court ... we would ask that these be used by the court," there is no showing in the record that requested Question No. 1, which included the requested definition of negligence, was ever formally presented to the court for ruling. The word *charge* and the trial court's overruling the objection and *denying* "requests for issues" is not in compliance with the clear requirements of Rule 276, which we consider to be mandatory. Since there was no endorsement "refused" on the requested Question No. 1 and its accompanying definition of "negligence," error has not been preserved for appellate review. *Templeton v. Unigard Sec. Ins. Co.*, 550 S.W.2d 267, 269 (Tex. 1976); *Greenstein, Logan & Co. v. Burgess Marketing, Inc.*, 744 S.W.2d 170, 181 (Tex.App.—Waco 1987, writ denied); *Briethaupt v. Navarro County*, 675 S.W.2d 335, 339 (Tex.App.—Waco 1984, writ ref'd n.r.e.); *Governing Bd. v. Pannill*, 659 S.W.2d 670, 681 (Tex.App.—Beaumont 1983, writ ref'd n.r.e.); *Moffett v. Goodyear Tire & Rubber Co.*, 652 S.W.2d 609, 612 (Tex.App.—Austin 1983, writ ref'd n.r.e.). Texas Health's first and second points of error are overruled.

Next, Texas Health contends in its third through ninth points of error that the trial court erred in rendering judgment and in overruling its motions for new trial, or for remittitur because: 1) the actual and exemplary damages awarded were excessive (third point), 2) the jury's award for physical pain and mental anguish in the future was excessive (fourth point), 3) the jury's award for loss of earnings in the past was excessive (fifth point), 4) the jury's award for loss of earnings in the future was excessive (sixth point), 5) the jury's award for physical impairment in the past was exces-

sive (seventh point), the jury's award for physical impairment in the future was excessive (eighth point), and 6) the jury's award for medical care in the future was excessive (ninth point).

The awards made by the jury and the suggested remittitur by Texas Health are:

|  | Awards by the Jury | Suggested Remittitur |
|---|---|---|
| 1. Exemplary damages | $500,000 | $475,000 |
| 2. Physical pain and suffering in the future | 250,000 | 230,000 |
| 3. Loss of earnings in the past | 8,000 | 7,000 |
| 4. Loss of earnings in the future | 250,000 | 230,000 |
| 5. Physical impairment in the past | 10,250 | 9,000 |
| 6. Physical impairment in the future | 250,000 | 230,000 |
| 7. Medical care in the future | 40,000 | 30,000 |

Mrs. Krell, in addition to the testimony already noticed, testified in some detail concerning her general health and physical conditions from the date of her fall (October 23, 1989) to date the trial commenced (December 3, 1990). We summarize her testimony. She was thirty-one years of age at the time of her fall. She had a ninth-grade education. After the accident made the basis of this suit, she completed a vocational education course at CBM Education, requiring six hundred hours of classes.[2] After the accident she completed an internship associated with the CBM course at United Blood Services in Harlingen, which required one hundred sixty hours. She filled out and signed on August 23, 1990, forms representing that she would seek employment as a medical assistant. On October 29, 1990, she told Mr. Stephen E. McCourt, Director of Placement for CBM, that "because of a back injury she would not be able to work until at least December."

Jose Kuri, M.D., a Brownsville neurosurgeon, testified that he first saw Mrs. Krell as a patient in December 1989. She complained of excruciating backache and pain in the right leg, and she was limping. The doctor ordered diagnostic tests which revealed an abnormality in the L4–L5 disc of the lumbar spine. He described the problem as herniation, in which the inner fiber of the annulus fibrosis ruptures, weakens, and causes the disc to protrude; that this condition was caused by her fall on October 23, 1989, and resulted in the back and leg pain she suffered. He opined that the pain was associated with impingement of a nerve root, and his objective findings of the cause of her pain is consistent with her subjective complaint of constant and unending pain. Dr. Kuri said that there is no guarantee that Mrs. Krell will have relief from her pain, but he could not say for how many years she would continue to suffer.

Regarding impairment, Dr. Kuri stated that Mrs. Krell had limitations on her ability to lift, carry, push, or pull things weighing 30 to 60 pounds. She cannot work with her arms extended or above her shoulders. She is unable to lift patients as required by her position at the nursing home, and she is susceptible to re-injury. Although he stated that Mrs. Krell is not a good candidate for surgery, Dr. Kuri further stated that the probability of back surgery for her was more than 50 percent, and that the operation would cost between $30,000 and $40,000.

Raul Garza, M.D., practices general medicine in San Benito, Texas. He stated that

2. The statement of facts does not reveal how many hours were spent in class before the accident nor does it show the number of hours in class after the accident.

he accepted Dr. Kuri's diagnosis of a herniated disc in Krell's lumbar spine. The malady was related to the at-work injury which Mrs. Krell suffered in October 1989. Dr. Garza testified that Mrs. Krell would suffer pain through her life, requiring pain medication, muscle relaxants, and warm packs. Mrs. Krell could not work as a medical assistant, now or in the future, according to the doctor. He said he would not hire her, and that people with back problems are not able to get work if they admit their condition to a prospective employer. He further testified as to Mrs. Krell's impairment, both present and future. He said she had demonstrated mental anguish, especially at being unable to work.

Everett Dillman, Ph.D., a business economist and vocational expert, testified that he had done an assessment of the present-day value of Mrs. Krell's earning capacity. He provided calculations on the amount of time which had passed since the accident and calculated her life expectancy based on life tables. He said that the current value of her earning capacity based on a work life table which takes into account the probability of premature death, illness, accidents, or retirement at age 60 was $230,000, and the value based on a work life to age 70 was $292,000. Dr. Dillman also had expertise in the field of nursing, having served as a consultant to an association and a nursing school in New Mexico, and having conducted studies in the field. He stated that a person with the educational background and type of limitations described would be unable to work as a nurse's aide, and would be one hundred percent vocationally disabled.

After Mrs. Krell's injury, Rene Garcia fashioned a makeshift repair by placing a plastic pan between the air conditioner and the ceiling, and emptying the pan of water twice a day. This was done because he was unable to obtain or purchase the tools and supplies he needed for a proper repair job in spite of his attempts through his superiors to be furnished the needed tools and supplies.

Mrs. Krell began working at Sun Valley in May 1989. She worked with "skilled care" patients, who could not do anything for themselves. Fifteen rooms, containing 20 to 30 patients, were cared for by two nurse's aides. The patients had to be physically turned in their beds every two hours. They often required cleaning; soiled bedsheets had to be changed frequently. Mrs. Krell testified that she had always been very active before her injury. Her employment history prior to the job at Sun Valley included a warehouse position with a restaurant supply company, and a position as a counter person with an auto parts business. Mrs. Krell further stated that the injury prevented her from doing almost everything she used to do for enjoyment, including working at home, gardening, driving a tractor, and doing mechanics work; that she is no longer able to enjoy camping, hunting, and fishing with her three children, who range in age from 12 to 16 years; and that prior to the accident her relationship with her husband of 17 years was "great," but the fall had "pretty much destroyed her home life."

Although she did complete a course to be a medical assistant following her injury, it was very painful to sit through the classes. She said that she completed the 160–hour externship course only after obtaining a prescription from her doctor allowing her to complete the hours on a part-time basis. She also stated that although her doctor is trying to help her pick up her spirits, "I would rather not live. I just feel like I'm a burden to everybody. I don't have a good-looking future."

Rene Garcia, the maintenance supervisor at Sun Valley at the time of Mrs. Krell's injury, testified by deposition. He testified that he had been hired due to his experience and training in air conditioning. When he was hired at Sun Valley, Ms. Dora Berlanga, the head of housekeeping, was supposed to show him "the basics." Texas Health was supposed to send a maintenance person from its headquarters in Denton, Texas, to give him a better understanding of his job, but this never happened. Garcia said he was never provided proper tools for maintenance work, and

that he supplied the few that he had. When he spoke to Mr. Genaro Davila, the administrator of Sun Valley, about this, he was assured he was to obtain a line of credit for both tools and supplies from Wickes Lumber, but this never took place. He said that Texas Health had a problem with overdue accounts, and the store would only open 30–day accounts. At Davila's instruction, Garcia sent a Wickes credit application to the home office of Texas Health. When he later checked at Wickes he was told that Texas Health had never returned the application. Garcia had no authority to buy anything on his own. Instead, purchases had to be cleared both by Davila and Mr. Paul Keller, corporate engineer for maintenance at the home office of Texas Health, in Denton. Garcia indicated that for a variety of reasons, water on the floor was a constant problem at Sun Valley. The shiny tile floor had bumps or indentations on it, giving the appearance of standing water even when the floor was dry. He said he was made aware of the leak in the air conditioning unit before the accident and performed an inspection of the unit in question. He reported the condition to Davila, his supervisor, and requested parts and supplies to make the necessary repair. This took place from two to six weeks before Krell's injury. Davila at first told him that if he could get the money from Denton he would be able to get the necessary materials for the repair. Garcia found water again in the same location the day following his conversation with Davila and again reported it to Davila, who told him that he had no money and to fix it the best way he knew how.

Mr. Charles Boudreaux, risk manager for Texas Health, testified that while working as an administrator, he had gone to the point of taking money out of his own pocket to make purchases for a nursing home, and that a prudent manager would do so when the need arises.

Paul Keller confirmed Garcia's testimony regarding the company's inability to obtain credit. He testified that Texas Health would not approve more than one account for similar services, and because of delays in their accounts payable department it was unable to do business with vendors who require payment within 30 days.

Texas Health, in its challenge to the awards made by the jury, states in its brief: "throughout the testimony of Doctors Kuri and Garza, it is obvious that they relied largely on Krell's representations to them about her pain, ability to carry on activities, etc., and that those representations were of continual pain and general inability to carry on normal activities." It further states that "the witness with by far the most opportunity to observe Krell between the time of the accident (October 23, 1989) and the trial (December 3–10, 1990) was Jeannie Oaks."

We summarize Mrs. Oaks' testimony. She was a close friend of Mrs. Krell during the approximately one year between the accident and trial. Their relationship was variously described during the trial as "friends" and "best friends." Mrs. Krell found out about her potential job at the nursing home through Oaks. They were co-workers at the time of the accident. They maintained their friendship after the accident. For instance, Oaks accompanied Mrs. Krell to her pre-trial deposition. She and Mrs. Krell went to a five-hour car race in McAllen in August, 1990. Three months before the trial, Oaks moved from Cameron County to Cuero, Texas. After she moved, Mrs. Krell made three round trips by automobile, each for multi-day visits with Oaks in Cuero, and Oaks made one trip from Cuero to Cameron County for a multi-day visit with Krell. Oaks said that she saw no difference in how Mrs. Krell walked before and after the accident. The only time after the accident that she ever saw Mrs. Krell limp or walk differently was when Mrs. Krell's deposition was taken. In general, Oaks observed Mrs. Krell walking considerable distances, going to several multi-hour car races, taking numerous four-hour car trips, picking up pecans, making up a bed, helping her (Oaks) pack to move, and numerous other various activities, all without any significant problems.

The proper standard of review for excessive damages points is factual suffi-

ciently of the evidence. *Rose v. Doctors Hosp.*, 801 S.W.2d 841, 847–848 (Tex.1990); *Pope v. Moore*, 711 S.W.2d 622, 624 (Tex. 1986). In reviewing the factual sufficiency of the evidence, the court will consider all of the evidence which supports and which is contrary to the jury's determination. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989). The court will set aside the verdict only if the evidence, standing alone, is too weak to support a finding, or the answer is so against the overwhelming weight of the evidence that it is manifestly unjust or clearly wrong. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). If there is any evidence of probative force to support the finding of the jury, the finding must be upheld. *In re King's Estate*, 244 S.W.2d 660, 661 (Tex.1951).

■ Because personal injury damages are not capable of measurement by a specific standard, they are uniquely within the province of the trier of fact. *Southwestern Bell Tel. Co. v. Wilson*, 768 S.W.2d 755, 763 (Tex.App.—Corpus Christi 1988, writ denied). This Court may not substitute its judgment for that of the jury, the fact finder in the present case. *Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 641 (Tex. 1987).

Concerning the excessiveness of the jury's awards for damages, the Supreme Court stated in *Dallas Ry. & Terminal Co. v. Farnsworth*, 148 Tex. 584, 227 S.W.2d 1017 (1950):

> [T]he amount of the verdict itself, when considered in light of the evidence ..., may be enough to convince the Court ... that it was the result of passion or prejudice or other improper motive or was in disregard of the evidence ... [T]here need not be extraneous proof of passion or prejudice on the part of the jury. Indeed, it would be in many cases very difficult and often impossible to make that proof.

*Id.* 227 S.W.2d at 1022. *See also, Flanigan v. Carswell*, 159 Tex. 598, 324 S.W.2d 835, 841 (1959).

Texas Health, in support of its position that the damage awards for physical pain and mental anguish in the future, for phys-

ical impairment in the future and for loss of earning capacity in the future argues: 1) the plaintiff put on an economist who projected future lost earnings of more than $200,000, but this was based on the assumption of total and permanent injury, 2) when one considers damage awards such as $250,000 for physical pain and mental anguish in the future, and an additional $250,000 for physical impairment in the future, and still another $250,000 for loss of earning capacity in the future, it is obvious from the facts in this case and from the amounts of the awards alone that this jury was affected by some sort of passion or prejudice that goes beyond the norm of a fair trial, and 3) these amounts, under the circumstances and evidence of this case, shock the conscience of a court.

■ Whether an award of damages is excessive is to be determined by the jury based on all of the facts of the case; in passing on whether a verdict for damages is excessive, the evidence in support of the award must be viewed in the light most favorable to the award. *See* 28 TEX.JUR. 3d, Damages § 355. In an action to recover damages for personal injuries, the amount to be awarded rests primarily with the jury, and unless the award is so large as to indicate that it was the result of passion, prejudice, partiality, or corruption, or that the evidence has been disregarded, the verdict of the jury will not be set aside or remittitur suggested by the appellate court; and determination of the amount of money that will compensate the plaintiff for physical injuries, impairment and mental anguish involves a consideration of elements for which no mathematical standard exists, except what an honest or impartial jury, uninfluenced by passion, prejudice, or other improper motive may deem adequate. *See* 28 TEX.JUR.3d, Damages, §§ 358, 359. *See also Montgomery Ward & Co. v. Hernandez*, 661 S.W.2d 159, 161–162 (Tex. App.—Corpus Christi 1983, no writ); *Apache Ready Mix Co. v. Creed*, 653 S.W.2d 79, 84 (Tex.App.—San Antonio 1983, writ dism'd).

■ There is sufficient evidence upon which to conclude that Krell will suffer

lifelong pain, which would support an award of $250,000 for physical pain and mental anguish in the future. Dr. Dillman's testimony warrants the $8,000 award for lost earnings in the past, and his uncontroverted testimony supports the award of $250,000 found as lost future earning capacity. Both doctors testified to past and future impairment, and the amounts of $250,000 awarded are supported by the evidence. Dr. Kuri stated that surgery was probable, and that it would cost as much as $40,000, the amount the jury awarded for future medical care. The medical evidence supports a reasonable inference that future doctor visits and medication may also be necessary and that the award is reasonable.

### EXEMPLARY DAMAGES

■ Exemplary damages may not be awarded as a result of ordinary negligence, but must be based on gross negligence, or willful conduct. *American Nat'l Ins. Co. v. Navarette*, 758 S.W.2d 805, 809 (Tex. App.—El Paso 1988, writ denied); *Hylander v. Groendyke Transport, Inc.*, 732 S.W.2d 692, 694 (Tex.App.—Corpus Christi 1987, writ ref'd n.r.e.). Such conduct may be active or passive in nature. *Ford Motor Co. v. Nowak*, 638 S.W.2d 582, 593 (Tex. App.—Corpus Christi 1982, writ ref'd n.r.e.).

■ The standard for determining whether gross negligence is a ground for sustaining an award of exemplary damages is whether there is any evidence of "that want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be affected by it." *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 920 (Tex.1981). Therefore, the plaintiff must show that the defendant knew of the peril, or dangerous condition, but his acts or omissions show that he did not care about the right or welfare of others.

In *Delta Drilling Co. v. Cruz*, 707 S.W.2d 660, 666 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.) the jury, in a drilling accident case, found Delta negligent and grossly negligent, and awarded, among other awards, $1,910,450 for actual damages and $6,000,000 for exemplary damages. This Court said with respect to the award of exemplary damages:

[O]n appeal, the finding of the jury will not be disturbed on grounds of excessiveness if there is any probative evidence to sustain the award. We will not substitute our judgment for that of the jury unless the record indicates that the jury was influenced by passion, prejudice or improper motive. We will grant a remittitur only if after reviewing the evidence we find that the award is so excessive as to shock our conscience ... The amount awarded by the jury in this case is large, but the mere fact that an award is large is no indication of passion, prejudice or improper motive.... Some of the factors to consider in determining whether an award of exemplary damages is reasonable are: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; and (5) the extent to which such conduct offends a public sense of justice and propriety.... (citations omitted).

In *Lawson–Avila Constr., Inc. v. Stoutamire*, 791 S.W.2d 584, 599 (Tex.App.—San Antonio 1990, writ denied), $1,324,000 in actual damages and $1,500,000 in exemplary damages were awarded to the plaintiff by the jury. The San Antonio Court affirmed, and held that the award of exemplary damages of $1,500,000 was reasonably proportionate to the award of actual damages in the amount of $1,324,000.

The Court held in *Costa v. Storm*, 682 S.W.2d 599, 605 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.), in which the jury awarded the plaintiff $49,000 in actual damages and $125,000 in exemplary damages, that the ratio of exemplary damages to actual damages (2.9 to 1) was not unreasonable.

■ Texas Health operates 87 nursing homes throughout Texas. In light of the conduct of the company's management, in essentially making it impossible for Rene

Garcia to do his job by ignoring his requests for tools, supplies, and materials, as well as in thwarting his attempt to obtain a line of credit to obtain those things, the jury's award of exemplary damages of $500,000 is justified.

After careful consideration of all of the facts in this case, and with due regard to the weight that should be given to the findings of the jury, and the superior position of the trial court to evaluate the merits of the motion for new trial, we hold that there was sufficient evidence to uphold the jury's finding that Texas Health was grossly negligent, and that the award of $500,000 is not such as to "shock our consciences." We further find that there is no evidence that the jury arrived at its awards for actual damages and exemplary damages as a result of passion, prejudice, or improper motive, or that it disregarded the evidence. In the cases of *Delta* and *Costa*, cited above, the ratio of exemplary damages to actual damages was approximately 3 to 1. The ratio in the instant case is far less than that in the cited cases. Considering all relevant factors, we conclude that the awards of actual damage and of exemplary damages, hereinbefore detailed, are not excessive. Texas Health's third, fourth, fifth, sixth, seventh, eighth and ninth points of error are overruled.

Texas Health asserts in its tenth point of error that "the trial court erred in rendering judgment and in overruling the motion for new trial because incurably prejudicial jury argument was presented on behalf of plaintiff implying that a key witness (Jeannie Oaks) had been improperly influenced by THE (Texas Health)." It claims in its fifteenth point of error that "the trial court erred in rendering judgment and in overruling the motion for new trial because incurable prejudicial jury argument was presented on behalf of the plaintiff injecting credibility of counsel into the case on the issue of gross negligence." Since both points are somewhat related, we will discuss them together.

Counsel for Mrs. Krell did not mention Jeannie Oaks, or her testimony, in his opening argument. Counsel for Texas Health,

however, did refer to her testimony in his arguments, to-wit:

> Who has a motive here? What motive did Jeannie Oaks have to come lie to you? This is her best friend. She told you that. They want you to believe that Jeannie Oaks was a spy for Texas Health Enterprises.
>
> \* \* \* \* \* \*
>
> Again, she (Mrs. Krell) was lying, Ladies and Gentlemen. We proved that. Not just with Jeannie Oaks....
>
> \* \* \* \* \* \*
>
> Everything in this case was going well for Judy Krell until she was betrayed. And what was she betrayed by? Her best friend, the placement guy at CBM? No, by the truth. She never thought Jeannie Oaks would come testify.

Counsel for Mrs. Krell made the following remarks in his closing argument.

> Jeannie Oaks. I have to talk about Jeannie Oaks. You know, Jeannie Oaks comes in here purportedly as her best friend and omits all of the things a best friend would say. Sure she drove over there to Cuero with her, but she had a pillow under her back. She didn't say that until Ms. deLeon got it out on cross-examination. Well, sure we went to the bleachers, but Judy had to come down. She didn't say that until we got it out on cross-examination.
>
> If a best friend gets up here and tells the whole truth and nothing but the truth, then it wouldn't have come out as one sided as it came out. She's got relatives and people still working there in that nursing home in close contacts with that nursing home. There is something rotten in Denmark with Jeannie Oaks, Ladies and Gentlemen. You can take it as you want. That lady came in here with motive. She's the only one out of all these people that came in here and said, Well, I'm just going to go ahead and dump on Judy Krell.
>
> In particular, Ms. Oaks testified that she left her job at Sun Valley in September 1989, and that she continued to have a good relationship with the nursing home. Her

stepmother worked there as a dietician. Her sister-in-law was a former cook at Sun Valley. Mini Pedraza, the charge nurse, was also her good friend. On cross examination, she acknowledged several omissions from her testimony on direct examination. Regarding a trip she had taken with Mrs. Krell to an auto race, she stated Ms. Krell said "that her back was bothering her." Regarding a second trip to such a race, she said that Mrs. Krell had to come down from the bleachers stating, "I can't take it, I have to leave." Ms. Oaks further stated on cross examination:

Q. Did you ever tell Judy that you were talking to the nursing home personnel, to the directors or to the people over at the nursing home about everything she did?
A. No.
Q. So what you did is that you called her, you invited her to your home, you included her in activities, you accepted their hospitality, all those things, and you shared things about the family; is that correct?
A. Yes.
Q. But never in that time did you ever tell her, "By the way, I'm telling them everything you are doing?"
A. No.
Q. You remember exactly how everything happened, don't you, Mrs. Oaks?
A. Nobody is perfect, you know.

■■■■ To obtain reversal of a judgment on the basis of improper jury argument, an appellant must prove the argument by its nature, degree, and extent constituted harmful error. *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839–40 (Tex.1979). The complaining party must prove: 1) an error; 2) that the error was not invited or provoked; 3) that the error was preserved by the proper trial predicate, such as an objection, motion to instruct, or motion for mistrial; 4) that the error was not curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the trial judge; and 5) that the argument by its nature, extent and degree constituted reversibly harmful error. *Standard Fire*, 584 S.W.2d at 840; *Reveia v. Marine Drilling Co.*, 800 S.W.2d

252, 258 (Tex.App.—Corpus Christi 1990, writ denied). The appellant must show that the probability that appellee's final argument caused harm is greater than the probability that the verdict was grounded on proper proceedings and the evidence. *Rodriguez v. Universal Fastenings Corp.*, 777 S.W.2d 513, 519 (Tex.App.—Corpus Christi 1989, no writ). "All of the evidence must be closely examined to determine the argument's probable effect on a material holding." *McInnes v. Yamaha Motor Corp.*, 659 S.W.2d 704, 713 (Tex.App.—Corpus Christi 1983), *affirmed*, 673 S.W.2d 185 (Tex.1984), *cert. denied*, 469 U.S. 1107, 105 S.Ct. 782, 83 L.Ed.2d 777 (1985). The appellate court must evaluate the improper jury argument in light of the whole case, beginning with voir dire and ending with closing argument. *Luna v. North Star Dodge Sales, Inc.*, 667 S.W.2d 115, 120 (Tex.1984).

■■■■ Texas Health complains of a literary reference to *Hamlet* by Mrs. Krell's counsel in closing argument, that "something is rotten in Denmark" with regard to the witness Jeannie Oaks. Literary references, like hyperbole, "are a part of our legal heritage and language," and are entirely proper. *Standard Fire*, 584 S.W.2d at 838 (citing six quotations from Shakespeare, including two from *Hamlet*).

No objection, motion to instruct, or motion for mistrial was raised by Texas Health during counsel for Mrs. Krell's closing argument. Texas Health argues in its brief that the argument made by counsel for Mrs. Krell in his closing argument was "incurably prejudicial" in that it "brought before the jury 'information' which was not in the record; 'imaginary testimony' that was never subject to cross-examination;" it claims that such argument is an attempt to charge Mrs. Oaks with wrongdoing to destroy her credibility.

Without deciding whether the remarks made by Mrs. Krell's counsel was of such nature as would mandate a reversal under *any* circumstances, the remarks were not so prejudicial as to demand a reversal in the absence of an objection by counsel for Texas Health at the time the remarks were

made. *See Texas & N.O.R. Co. v. Sturgeon*, 142 Tex. 222, 177 S.W.2d 264, 266 (1944). Considering the length to which the Supreme Court of Texas has gone in holding appeals to prejudice to become harmless under the "harmless error rule," it is logical to require prompt objection in the "imaginary testimony" type of case. *Wade v. Texas Employer's Ins. Ass'n*, 150 Tex. 557, 244 S.W.2d 197, 201 (1951). The remarks by counsel for both parties were vague and it might very well be that such remarks did not have the effect attributed to them by Texas Health. This Court, in *Rodriguez*, 777 S.W.2d at 518–519, rejected a challenge to a jury argument which referred to information outside the evidence, where no objection was raised at trial (settlement amount, outside the record "would have been huge to a Rockefeller").

Texas Health's reliance upon *Howsley & Jacobs v. Kendall*, 376 S.W.2d 562 (Tex. 1964); *Cross v. Houston Belt & Terminal Ry. Co.*, 351 S.W.2d 84 (Tex.Civ.App.—Houston 1961, writ ref'd n.r.e.); *Rogers v. Broughton*, 250 S.W.2d 606 (Tex.Civ.App.—Austin 1952, writ ref'd n.r.e.); and *Airline Motor Coaches, Inc. v. Campbell*, 184 S.W.2d 532 (Tex.Civ.App.—Beaumont 1944, writ ref'd n.r.e.) is misplaced; they are not in point and are distinguishable on the facts from the case at bar.

In *Howsley & Jacobs*, counsel for plaintiff told the jury, "You knew the truth but you knew it wasn't coming from the testimony of Robert Myers, because Robert Myers was not testifying. Somebody was testifying through the lips of Robert Myers." The Court held that this statement, coupled with counsel's reference to a "battery of lawyers" irretrievably prejudiced defendant. Here, there was no suggestion of perjury and no reference was made to counsel for Texas Health.

In *Cross*, the Houston Court reversed a judgment because counsel for the defendant stated to the jury, "When he (plaintiff) hired these attorneys it was just a question of manufacturing testimony, and they went out and hired any witnesses they can get to say things that you have heard from this witness stand here." The remarks by counsel for Mr. Krell in the present case did not imply that the attorneys for Texas Health had "manufactured" any testimony from anyone.

The Austin Court reversed the judgment of the trial court in *Rogers* because counsel for the defendant stated, "I can't say if they (witnesses) were confused, and if they were not interested, they would have either ascertained their mistake, if any, by going in that other place of business—which I state that they never have been in, if they were not interested." There is no suggestion in the case now before us in their appeal that Mrs. Oaks was an interested witness.

In *Airline Motor Coaches*, the San Antonio Court held the following argument constituted reversible error: "I don't know, Gentlemen of the Jury, whether somebody greased his (witness') palm or not, but I will say that he was in this courthouse and after they didn't put him on, I will say that something happened when he testified like he did." Nothing similar to those statements indicating bribery were made by counsel for Mrs. Krell in the instant case.

We hold that since Texas Health did not object to the argument, request that it be disregarded by the jury, or move for a mistrial, the error, if any, was waived. We further hold that the argument was not reasonably calculated to cause or did cause the rendition of an improper judgment. *Birchfield v. Texarkana Memorial Hosp.*, 747 S.W.2d 361, 365 (Tex.1987); Tex. R.App.P. 81(b)(1). Texas Health's tenth and fifteenth point of error are overruled.

## NO PLEADINGS (ASSERTED)

It is asserted by Texas Health in its eleventh point of error that "the trial court erred in such written instructions and questions on exemplary damages; rendering judgment; overruling the motion for judgment n.o.v., inducing the supplement thereto; and in overruling the motion for new trial because there was no pleading to support an award of exemplary damages and the purported post-trial amendments cannot legally be treated as the controlling pleading."

Trial in this case commenced on December 5, 1990. On that date, Mrs. Krell's trial petition was her "Fourth Amended Original Petition," which was filed on November 7, 1990. She alleged in Paragraph VI:

Plaintiff represents that the negligent acts of Defendant and its agents listed above were committed in needless and reckless disregard of the rights of Plaintiff and were in entire want of care and conscious indifference to the rights, welfare, or safety of the persons affected by them, such as to constitute gross negligence for which Defendant should be assessed exemplary damages.

Tex.R.Civ.P. 301 provides, among other provisions, that "[t]he judgment of the court should conform to the pleadings...." The purpose of pleading is to give the adversary parties notice of each party's claims and defenses, as well as notice of the relief sought. *Perez v. Briercroft Serv. Corp.*, 809 S.W.2d 216, 218 (Tex.1991). In determining whether a cause of action was pleaded, the plaintiff's pleadings must be adequate for the court to be able, from the pleadings alone, to ascertain with reasonable certainty and without resorting to information from another source, the elements of the plaintiff's cause of action and the relief sought with sufficient information on which to base a judgment. *Stoner v. Thompson*, 578 S.W.2d 679, 683 (Tex.1979); *Henderson v. Henderson*, 694 S.W.2d 31, 35–36 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.). The general rule is that pleadings will be construed as favorably as possible to the pleader. *Gulf, C. & S.F. Ry. Co. v. Bliss*, 368 S.W.2d 594, 599 (Tex.1963); *Henderson*, 694 S.W.2d at 36. The court will look to the pleader's intendment and the pleading will be upheld even if some element of a cause of action has not been specifically alleged. Every fact will be supplied that can reasonable be inferred from what is specifically stated. *Bliss*, 368 S.W.2d at 599. Relief consistent with the theory of the claim reflected in the petition may be granted under a general prayer. *Jennings v. Texas Farm Mortg. Co.*, 80 S.W.2d 931 (Tex.1935).

Pleadings are to be construed liberally, particularly when the complaining party has not filed any special exceptions. *See Paramount Pipe & Supply Co. v. Muhr*, 749 S.W.2d 491, 496 (Tex.1988). In the absence of a showing of surprise or prejudice by an opposing party, a trial court must grant leave to a party to amend his or her pleadings, where the amendment raises no new substantive matters. *Greenhalgh v. Service Lloyds Ins. Co.*, 787 S.W.2d 938 (Tex.1990).

Texas Health did not except to any portion of Mrs. Krell's "Fourth Amended Original Petition." Considering *only* that petition, and the proof adduced at trial, the judgment conforms to the pleadings and the evidence. *See Brownsville Navigation Dist. v. Izaguirre*, 800 S.W.2d 244, 247–48 (Tex.App.—Corpus Christi 1990, writ requested).

The verdict of the jury was filed on December 10, 1990. Mrs. Krell filed on January 9, 1991, a motion for leave to file a trial amendment "for purposes of conforming Plaintiff's pleadings to the amount of exemplary damages awarded by the jury." Texas Health contested the motion by filing a response on January 11, 1991. A trial amendment was filed by Mrs. Krell on January 8, 1991. Then on January 22, 1991, Mrs. Krell filed motion for leave to file a post-verdict trial amendment, in which she again pleaded that it was "requested for purposes of conforming Plaintiff's pleadings to the amount of exemplary damages awarded by the jury." On the same day, January 22, 1991, Mrs. Krell filed her "Sixth Amended Original Petition," in which she alleged in Paragraph VI:

Plaintiff represents that the negligent acts of Defendant and its agents listed above were committed in needless and reckless disregard of the rights of Plaintiff and were in entire want of care and conscious indifference to the rights, welfare, or safety of the persons affected by them, such as to constitute gross negligence for which Defendant should be assessed exemplary damages in the

amount of Five Hundred Thousand Dollars ($500,000.00).[3]

Texas Health did not object or except to the filing of this petition.

A hearing was set on the motion filed by Mrs. Krell on January 22, 1991 for January 28, 1991. The record does not show that the trial court granted leave to Mrs. Krell for the filing of any post-verdict pleadings.

Mrs. Krell asked in her Fourth Amended Original Petition that she recover damages "in a sum in excess of the minimum jurisdictional limits of the court." The same request appears in her prayer in her Sixth Amended Original Petition.

The Supreme Court of Texas addressed the matter of post-verdict trial amendments in *Greenhalgh v. Service Lloyds Ins. Co.,* 787 S.W.2d 938 (Tex.1990), when it stated:

It is well established that a party may amend its pleading after verdict but before judgment. *American Produce & Vegetable Co. v. J.D. Campisi's Italian Restaurant,* 533 S.W.2d 380, 386 (Tex. Civ.App.—Tyler 1975, writ ref'd n.r.e.). Rule 63 states:

Parties may amend their pleadings, ... as they may desire by filing such pleas with the clerk at such time as not to operate as a surprise to the opposite party; provided, that any amendment offered for filing within seven days of the date of trial or thereafter, ... shall be filed only after leave of the judge is obtained, which leave shall be granted by the judge unless there is a showing that such amendment will operate as a surprise of the opposite party. (Emphasis added).

The language of Rule 63 makes it clear that without a showing of surprise the trial court must grant leave for a party to file the amendment when requested within seven days of trial or thereafter. Thus, a party's right to amend under Rule 63 is subject only to the opposing party's right to show surprise. *Hardin*

*v. Hardin,* 597 S.W.2d 347, 349 (Tex. 1980). ...

\* \* \* \* \* \*

An amended pleading that changes only the amount of damages sought does not automatically operate as surprise within the contemplation of Rule 63. *See Drury v. Reeves,* 539 S.W.2d 390, 394 (Tex.Civ.App.—Austin 1976, no writ).

*Id.* at 940.

The "defect" that Mrs. Krell sought to cure by her amendment was to conform her pleadings to the evidence and the jury finding on exemplary damages. Thus, no new matters of substance were raised by the pleading. There is some evidence that the post-verdict trial amendment did not surprise Texas Health. Mrs. Krell, in her requested definitions and questions, filed on December 3, 1990, in her proposed "Definition No. 6," requested:

"Exemplary damages" means an amount that you may in your discretion award as an example to others and as a penalty or by way of punishment, in addition to any amount that you may have found as actual damages.

The exact language of the requested definition by Mrs. Krell appears in the court's charge to the jury.

■ As above stated, there is no written order granting leave to file post-verdict pleadings. Texas Health argues that it was mandatory under Tex.R.Civ.P. 63 that leave of court *must* be obtained before a litigant can file a post-verdict pleading, and since this was not done, "the judgment for exemplary damages cannot stand." We disagree. The cases relied upon by Texas Health are pre-*Greenhalgh* cases. As we read *Greenhalgh,* when there is no surprise shown, as is the case here, the trial court *must* grant leave to file the post-verdict pleading. Here, Texas Health did not show surprise, and had the motion for leave to file been timely presented, the trial court would have been required to grant it. Therefore, the failure to obtain leave of court to file the post-verdict trial amend-

---

**3.** The identical allegation also appears in the trial amendment which was filed by Mrs. Krell, without leave of court, on January 8, 1991.

ment and the Sixth Amended Original Petition was harmless. Texas Health's eleventh point of error is overruled.

### MANAGEMENT–LEVEL EMPLOYEES

Texas Health claims in its twelfth point of error that "the trial court erred in rendering judgment for exemplary damages and in overruling the motion for judgment n.o.v. because there was no evidence of gross negligence by a managerial level representative of THE (Texas Health)." It further claims in its thirteenth point of error that the evidence was factually insufficient to support a finding of gross negligence by a managerial level representative. We disagree.

■ In Texas, an award of exemplary damages against a corporation may only be upheld if one of the following is shown: 1) that the corporation authorized the doing and manner of the act, 2) that the employee was unfit and the corporation was reckless in employing him, 3) that the employee was employed in a managerial capacity and was acting in the scope of his employment in connection with the conduct in question, or 4) that the corporation ratified or approved the act. *Purvis v. Prattco, Inc.*, 595 S.W.2d 103, 104 (Tex.1980); *Fisher v. Carrousel Motor Hotel, Inc.*, 424 S.W.2d 627, 630 (Tex.1967).

Here, Mrs. Krell proceeded on the theory that the act or omission constituting gross negligence was that of a management level employee. This was encompassed within the definition of "gross negligence" included in the charge, which provides:

> The act or omission must have been that of a management employee of Texas Health acting in the scope of employment.

Rene Garcia, at the time of the accident, was a maintenance employee at the Sun Valley nursing home. He was a high school drop-out and had six months of additional vocational education dealing with air conditioning and refrigeration. Mrs. Krell contends that Garcia, Genaro Davila, and Paul Keller each can properly be considered as management-level employees. Texas Health contends otherwise.

In reviewing the legal sufficiency of the evidence, the appellate court will consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *International Armament Corp. v. King*, 686 S.W.2d 595, 597 (Tex.1985). If an appellant is attacking the legal sufficiency of the evidence to support an adverse finding to an issue on which he did not have the burden of proof, he must demonstrate on appeal that no evidence supports the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983). If there is any evidence of probative force to support the finding of the jury, the point will be overruled and the finding upheld. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661–662 (1952). Thus, if there is more than a scintilla of evidence to support the finding, the no evidence challenge fails. *Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex.1987). If the evidence furnishes some reasonable basis for differing conclusions by reasonable minds as to the existence of the vital fact, it amounts to more than a scintilla of the evidence. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983).

■ It is well settled that an employer may be held liable in exemplary damages for the acts of certain employees. The rule applies to the acts of a worker employed in a managerial capacity and who is acting in the scope of his employment. *Ramos v. Frito–Lay, Inc.*, 784 S.W.2d 667, 668 (Tex. 1990); *King v. McGuff*, 234 S.W.2d 403, 405 (Tex.1950).

■ We hold that both Genaro Davila and Paul Keller were grossly negligent in failing to provide Garcia with the proper tools and supplies and in preventing him from being able to purchase those tools and supplies. This, in turn, prevented Garcia from being able to repair the leaky air conditioner, which caused Mrs. Krell's injuries. As administrator of the Sun Valley nursing home, Davila was in a management position. Keller was a corporate level employee, involved in management of the company. He appeared at the trial as corporate representative for Texas Health.

■ The record also gives ample support for the jury's conclusion that Garcia was himself a manager. His immediate supervisor, Genaro Davila, referred to Garcia as a department head, a management level employee, and a supervisor. Charles Boudreaux, risk manager for Texas Health, testified that "the maintenance man would be a department head," at a management level. Boudreaux makes it clear that each facility administrator determines whether the maintenance man is management level. In this case, the administrator, Davila, stated he structured his facility in this manner.

Garcia, Davila, and Keller were all management-level employees, and each was guilty of gross negligence as indicated above. The jury's finding is supported by sufficient probative evidence. Texas Health's twelfth and thirteenth points of error are overruled.

### ADMISSION OF EXHIBITS

■ Texas Health contends in its fourteenth point of error that "the trial court erred in rendering judgment and in admitting over objection plaintiff's exhibits 12 and 13 because they were irrelevant to any issue in the case and overly prejudicial to THE (Texas Health)." We disagree.

Exhibits 12 and 13 are copies of documents generated by an intra-company headquarters which periodically makes safety inspections of the nursing homes. Walker makes some critical comments in the exhibits about safety at Sun Valley, but these comments according to Texas Health, had no bearing on the accident made the basis of the lawsuit or on the alleged premises defect which was claimed to have caused the accident. Some of the critical comments were "Each resident is not protected from potential accident/injury," "Facility does not maintain a safe, clean, orderly environment," and "maintenance of building and equipment" are deficient under both State and federal requirements.

Texas Health argues that the exhibits simply served to defame it and its Sun Valley nursing home in the eyes of the jury, but did not have any bearing on any issue actually in the case. In particular, it takes the position that it had nothing to do with the premises defect made the basis of this suit. Also, the arguments are made: 1) that the introduction of the exhibits into evidence by Mrs. Krell was an attempt to show that because Texas Health had "an unsafe character, it was probably negligent on this occasion," 2) that this concept is similar to the rule of exclusion encompassed by Tex.R.Civ.Evid. 404(b), proof of "other wrongs or acts," which provides, subject to exceptions not applicable here, that "evidence of other wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith," 3) in a case where exemplary damages are sought, it gives the jury the opportunity to condemn and punish the defendant for conduct other than that involved in the issues of the case, 4) this is the very type of weak logical connection that is forbidden by Tex.R.Civ.Evid. 404(a), and 5) the evidence should have been excluded on relevance grounds under Tex.R.Civ.Evid. 403 in that whatever probative value it might have had on the triable issues was outweighed by its prejudicial effect.

■ The admission of evidence largely rests within the discretion of the trial court. *Jordan v. Fourth Court of Appeals,* 701 S.W.2d 644, 649 (Tex.1985); *Ginsberg v. Fifth Court of Appeals,* 686 S.W.2d 105, 108 (Tex.1985). The standard of review when the question involves whether the prejudicial effect outweighs the probative value of evidence, is "abuse of discretion." To determine whether an evidentiary ruling constitutes an abuse of discretion, the appellate court will review the entire record. *Southwestern Bell Tel. Co. v. Sims,* 615 S.W.2d 858, 862–63 (Tex. Civ.App.—Houston [1st Dist.] 1981, no writ).

We conclude that the exhibits were highly relevant to the negligence alleged. Mrs. Krell alleged both the failure to maintain a reasonably safe place to work and negligent activity in failing to maintain an air conditioning unit. Walker's findings, as stated in the report, were directly related to these allegations, even if her inspection

did not uncover the particular air conditioner which caused Mrs. Krell's injuries. Walker's inspection was made on the same day that Mrs. Krell was injured. We hold that the trial court did not abuse its discretion in admitting exhibits 12 and 13 into evidence. Texas Health's fourteenth point of error is overruled.

## CUMULATIVE ERROR

Texas Health asserts in its sixteenth and final point of error that "the trial court erred in rendering judgment and in overruling the motion for new trial because a new trial should have been ordered under the doctrine of cumulative error." Texas Health, in support of the point, argues: 1) there is likely a relationship between the incurably improper jury argument concerning Jeannie Oaks and the amounts awarded in the verdict, and if Oaks' credibility had not been damaged by that argument, far smaller amounts of damages would surely have been awarded; 2) there was also probably a relationship between the improper admission of exhibits 12 and 13 and both the finding of gross negligence and the imposition of exemplary damages, because the admission of those exhibits enabled the jury to punish it for conduct other than that for which it was on trial; and 3) there was certainly a connection between the improper jury argument of Mrs. Krell's counsel to the effect that the this was "the worst case of gross negligence he had ever seen" and the finding of gross negligence and the excessiveness of the award of exemplary damages.

Texas law recognizes that multiple errors, even if considered harmless taken separately, may result in reversal and remand for a new trial if the cumulative effect of such errors is harmful. *Scoggins v. Curtiss & Taylor*, 148 Tex. 15, 219 S.W.2d 451, 454 (1949); *Smerke v. Office Equipment Co.*, 138 Tex. 236, 158 S.W.2d 302, 304 (1941). This is particularly true when the errors interact with each other, at least to some extent, augmenting even their combined individual effects. *Id.* However, the cumulative error doctrine has evolved almost exclusively in cases involving jury argument or jury misconduct. *Town East Ford Sales, Inc. v. Gray*, 730 S.W.2d 796, 809–10 (Tex.App.—Dallas 1987, no writ). Dahlberg, Analysis of Cumulative Error in the Harmless Error Doctrine, 12 TEX.TECH L.REV. 561 (1981). Before a judgment will be reversed and a new trial ordered for cumulative error, an appellate court must determine that the error committed by the trial court was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *Ramos v. Champlin Petroleum Co.*, 750 S.W.2d 873, 877 (Tex.App.—Corpus Christi 1988, writ denied). In order to prevail on a cumulative error point, the appellant must show that, based on the record as a whole, but for the alleged errors, the jury would have rendered a verdict favorable to it. Tex.R.App.P. 81. Texas Health does not complain of jury misconduct. Its points on jury arguments are dealt with elsewhere. In order for Texas Health to prevail on its cumulative error point, it would have to show that, based on the record as a whole, but for the alleged errors, the jury would probably have rendered a verdict in its favor. *See Sendejar v. Alice Physicians & Surgeons Hosp., Inc.*, 555 S.W.2d 879, 888 (Tex.Civ.App.—Tyler 1977, writ ref'd n.r.e.). Texas Health did not meet that burden. In the light of our disposition of Texas Health's other points of error, we hold that the record in this case does not mandate a reversal because of cumulative error. Texas Health's sixteenth point of error is overruled.

The judgment of the trial court is affirmed.