Pamela Chambers **GORMAN, Individually and as Administratrix of the Estate of Dale Owen Gorman, Deceased, and as Next Friend of Amanda Marie Gorman, a minor, Appellants,**

v.

**LIFE INSURANCE COMPANY OF NORTH AMERICA, Appellee.**

No. 01–86–00501–CV.

Court of Appeals of Texas,
Houston (1st Dist.), 1993.

March 18, 1993.

Opinion Granting in Part and
Denying in Part Motions for Rehearing
June 10, 1993.

Rehearing Denied July 29, 1993.

Clinard J. Hanby, Houston, for appellant.

Arthur Stamm, Roger Townsend, Houston, for appellee.

Before DUGGAN, DUNN and MIRABAL, JJ.

## OPINION ON REMAND FROM THE TEXAS SUPREME COURT

DUGGAN, Justice.

This case involves the claim of Pamela Gorman that, as the beneficiary of Dale Gorman, she was entitled to $250,000 in insurance benefits under a Tenneco Inc. Travel Accident Insurance Plan, because Dale Gorman was killed in a traffic accident while in the travel and sojourn of Tenneco.

### Procedure of the Case

Pamela Gorman, individually and as next friend of Amanda Gorman, daughter of the deceased, originally sued Life Insurance Company of North America (LINA) and Tenneco Inc., alleging causes of action for breach of an insurance contract, breach of the duty of good faith and fair dealing, breach of fiduciary duty, fraud, violations of the Texas Insurance Code, and violations of the Texas Deceptive Trade Practices–Consumer Protection Act, among other causes of action. Following a jury trial, the trial court disregarded the jury's answer to jury question number one, concluding there was no evidence to support the jury's finding that Dale Gorman was in the travel and sojourn of Tenneco at the time of his death. The trial court rendered judgment n.o.v. that the Gormans take nothing on their claims.

The Gormans appealed the trial court judgment to this Court. Both LINA and Tenneco raised cross-points, asserting that all of the Gormans' claims were preempted under the federal Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001, et seq. (1985). This Court agreed that all of the Gormans' claims against Tenneco and LINA were preempted and rendered judgment that the Gormans take nothing. *Gorman v. Life Ins. Co. of N. Am.*, 752 S.W.2d 710, 714 (Tex.App.—Houston [1st Dist.] 1988).

The Gormans filed an application for writ of error to the Supreme Court of Texas. On March 27, 1991, the supreme court held that all of the Gormans' claims against Tenneco were preempted by ERISA. *Gorman v. Life Ins. Co. of N. Am.*, 811 S.W.2d 542, 547 (Tex.1991). The court also held that the Gormans' claims against LINA for penalties under the Insurance Code, for damages for mental anguish, and for exemplary damages, were likewise preempted by ERISA. *Id.* at 548–49. However, the court held the Gormans' claim for policy benefits was not preempted by ERISA and further held there was some evidence to support the jury's finding that Dale Gorman was in the travel and sojourn of Tenneco at the time of his death. The court

then remanded the cause to this Court to review the cross-points raised by LINA. *Id.* at 549, 550.

### LINA's Cross–Points

LINA asks this Court to determine two cross-points of error, as follows:

1. The evidence is factually insufficient to support the jury's answer to jury question number one that Dale Gorman was in the travel and sojourn of Tenneco at the time of his death; and

2. The trial court erred in denying LINA's motion for mistrial because the Gormans' improper jury argument impermissibly prejudiced the jury.

### Factual Sufficiency of the Evidence

■ In reviewing factual sufficiency challenges, the court of appeals must first examine all of the evidence, *Lofton v. Texas Brine Corp.*, 720 S.W.2d 804, 805 (Tex. 1986); *Glockzin v. Rhea*, 760 S.W.2d 665, 666 (Tex.App.—Houston [1st Dist.] 1988, writ denied), and, having considered and weighed all of the evidence, it should set aside the verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *Otis Elevator Co. v. Joseph*, 749 S.W.2d 920, 923 (Tex.App.—Houston [1st Dist.] 1988, no writ).

### Evidence Adduced at Trial

The language of the insurance policy that is central to this dispute is as follows:

The hazards against which insurance is granted under this policy are ... All those to which an Insured may be exposed *during travel and sojourn on the business of the Policyholder,* provided such travel is to a point or points located away from the premises of the Policyholder in the city of permanent assignment. The following shall specifically qualify the above:

(a) Coverage begins at the actual start of an anticipated trip whether it be from an Insured's place of employment, his home, or other location. Coverage termi-nates upon his return to his home or place of employment, whichever shall first occur;

(b) Commutation travel is excluded from coverage.

(Emphasis added.)

Evidence adduced at trial showed that Gorman was employed as a Senior Electronic Data Processing auditor. His general duties included reviewing computer systems and analyzing and commenting on the internal controls of such systems. His position description specified he would work under "minimum supervision." He was to perform the more complex audit assignments of the department. He had broad discretion regarding how he would handle his job.

The position entailed travel to various locations around Houston. His office was in the Tenneco Building at 1010 Milam in downtown Houston. His residence was in Webster, Texas. Evidence adduced at trial showed that Gorman drove his car to and from work the first few weeks of his employment, but since then, he usually rode to work on the bus with passes issued by Tenneco. The week of the accident, he was again driving his car because of a work-related seminar he was attending away from his office.

The evidence showed Gorman was assigned to three different projects during the week of his death. The first project was a payroll/personnel system. In this regard, his task was to attend meetings, give advice, and determine whether the payroll controls were adequate. The second project was a long term compensation plan. This was a computer system relating to executive compensation and stock options. The third project was a financial reporting system.

On the morning of the accident, Gorman attended a job-related seminar at the U.S. Home Building, 1177 West Loop South, in Houston. This was the third day of a week-long seminar. Gorman was the only one from his group attending the seminar. The purpose of the seminar was to allow a software vendor to give instructions con-

cerning a payroll/personnel system that Tenneco was considering acquiring. Gorman was attending as part of his duties as auditor of the payroll/personnel project.

He left the seminar around noon. As he left the seminar, several witnesses heard him state that he had a meeting to attend at the Tenneco Building, but that he would probably return to the seminar after the meeting.

At 2:00 that afternoon, Gorman attended a meeting at the Tenneco building. Gorman left the meeting at around 3:00 p.m., before the meeting was finished. Witnesses testified that, as Gorman left the meeting, he stated that he needed to leave early to return to the seminar.

As he left the office, Gorman also informed two secretaries that he was returning to the seminar. In the elevator on the way to the parking lot, Gorman remarked to another Tenneco employee, P.D. Puntch, that his day was not yet over.

The Accident

About 15 minutes after he left Tenneco, between 3:15 and 3:25 p.m., Gorman was killed in an automobile accident at the corner of Garrow and York. According to the accident investigator, Gorman was traveling north on York. The route was a possible (though unlikely) route back to the seminar.

To get to the seminar, Gorman could have continued north on York to I–10, then west to Loop 610. This would have required about 25 minutes, putting Gorman at the seminar at around 3:45 p.m. There was testimony that the seminar sometimes lasted past 4:00 p.m.

The route taken by Gorman was also a possible (although unlikely) route home. The normal route to Gorman's house would have been on Interstate 45. To reach home from the location of the accident, Gorman could have conceivably continued north on York to Navigation, taken Navigation past the point where it almost reaches the ship channel and turns south into Harrisburg, taken Harrisburg to where it turns into Broadway, taken Broadway to Old Galveston Road, and taken Old Galveston Road to

Webster. The evidence showed, however, that if Gorman intended to return home via these back roads, he almost certainly would have turned right off of York onto Harrisburg.

Gorman's normal workday was 7:00 a.m. until 4:15 p.m. He was described as ambitious, diligent, and hard working. He frequently worked overtime, and, according to his supervisor, it would have been extremely unusual for him to leave work an hour early.

Gorman's route did lead directly to the offices of his former employer, Brown & Root. Gorman's supervisor testified that Gorman had authority to go anywhere that he felt useful for the accomplishment of his tasks. The evidence showed that Gorman's duties at Brown & Root were similar to those at Tenneco. There was testimony that information available at Brown & Root could have been helpful on Gorman's projects at Tenneco and that auditors for large corporations frequently share information. One of Gorman's duties was to develop and maintain a library of computer programs. There was also testimony that auditors sometimes share software.

Based on the evidence, the jury found that Gorman was on travel and sojourn on the business of his employer.

LINA's Contentions about the Evidence

LINA contends that no one at Tenneco sent Gorman to the vicinity of the accident and that Gorman's supervisor at Tenneco knew of no business purpose Gorman had in the area of Garrow and York. LINA notes that none of the witnesses called by the Gormans could testify that Dale Gorman was on Tenneco business at the time of his death, nor could they explain his presence at the intersection where the accident occurred. LINA maintains that the Gormans offered nothing more than speculation, surmise, and conjecture about what Dale Gorman might possibly have been doing at the time of the accident.

LINA also argues that the only evidence regarding Gorman's possible return to the seminar offered by appellants was hearsay evidence from various Tenneco employees. LINA notes that, although this evidence

was admitted and heard by the jury regarding claims against Tenneco, it was not offered or admitted against LINA and, therefore, cannot constitute probative evidence against LINA.

We are able to identify two types of testimony critical to our disposition of this appeal. The first type of testimony consisted of statements made to Thornton, a Tenneco supervisor, or Patrick Nitsch, corporate counsel for Tenneco, by various Tenneco employees concerning what Gorman said on the day of his death. The first time that statements of this nature were offered, counsel for LINA obtained a running objection on the basis of hearsay. Later in the trial, LINA objected, confirmed the running objection, and requested and obtained a limiting instruction that the evidence was offered only against Tenneco.

The second type of testimony concerned the testimony of Tenneco employees about what they personally heard Gorman say on the day of his death. The witnesses to statements by Gorman as he left the seminar at the Systems Center on the West Loop around noon were Dan Nester and John Bruynincky. Both testified that Gorman said he would return to the seminar unless the downtown meeting lasted too long. Witnesses to Gorman's statements as he left the downtown meeting shortly before 3:00 p.m. were David Cook, William Schilling, Tula Loukanis, Mary Lou Jaso, and Paul Puntch. Cook, Schilling, Loukanis, and Jaso testified that Gorman said he was returning to the seminar. Puntch testified that Gorman said his workday was not over yet.

Appellants contend the trial court allowed all this evidence to be admitted against LINA when, late in the trial, Tenneco called Dan Nester, one of the persons whose deposition had been read, as a live witness. After Nester began to testify, the following exchange took place:

COUNSEL FOR LINA: If it please the Court, insofar as any testimony that may have been offered by this witness, an employee of Tenneco, on behalf of my client, I would object as far as any statement that the decedent made as hearsay; and would ask for a running objection to any conversations and ask the Court to instruct the jury that it is hearsay as to my client, Life Insurance Company of North America.

COUNSEL FOR PLAINTIFFS: May I respond? The issue in this case is whether—one of the issues in this case, is whether Mr. Gorman was on company business, in the furtherance of company business. These statements that this witness, as well as all of the witnesses in the course of the depositions taken and read, are relevant on that issue not only to Tenneco, but also to INA. And it is certainly not hearsay as to INA at this time.

And I would offer all such evidence as to both Defendant Tenneco and Defendant INA. It does not matter whether it is Tenneco employees or employees of Mobil Oil. These are statements of people who talked to the man and are admissible against both parties.

*Therefore, I would request and move that all of the heretofore offered be admitted against both Defendants.*

COUNSEL FOR LINA: The Insurance Company of North America is not a participant and not involved in these conversations. It is rank hearsay to my client. *And I would ask the Court to instruct the jury not to consider it.*

THE COURT: Overrule—I don't want to overrule the objections. But I take the position that the employees of Tenneco, especially insofar as doing the investigation and so on, may not be actual, but may be potential witnesses for the insured's company in the course of what they were doing.

COUNSEL FOR LINA: There is no such testimony to support that and certainly, I would object to any tender of evidence on behalf of the Plaintiffs after the Plaintiffs have rested. It is improper and should not now be permitted to make a tender.

THE COURT: It is not the Plaintiffs tender, as I understand. *But as to how she wants to treat the evidence. Overrule the objection.*

Go ahead.

(Emphasis added.) Nester then proceeded to testify that he overheard Gorman state that he would return to the seminar and "catch the last part of that meeting." We find that Nester's statements about Gorman's intention to return to the seminar were before the jury, as against LINA. LINA does not complain by way of cross-point about the trial court's ruling regarding Nester's testimony.

The Texas Supreme Court found the uncontroverted evidence established that Dale Gorman was attending a seminar away from his office at Tenneco on the day of his death. *Gorman*, 811 S.W.2d at 549. Gorman left the seminar at noon and attended a meeting at Tenneco at 2:00 p.m. *Id.* The supreme court noted:

> According to witnesses who also attended the seminar, Gorman informed another attendee that he had a meeting at his office but he would try to return to the afternoon session of the seminar. A witness who attended the meeting at Tenneco testified that Gorman left the meeting early and stated that he was going to return to the seminar.

*Id.* He left the meeting at Tenneco early and was killed in a traffic accident at the intersection of Garrow and York streets, at 3:25 p.m. *Id.* There was testimony that the location of the accident was neither on the most direct route back to the seminar nor on the most direct route to Gorman's home. *Id.* The supreme court concluded, "Given this evidence, the jury could have inferred from the testimony that Gorman was on business at the time of the accident." *Id.*

■ In its cross-point, LINA argues that, even if the evidence is legally sufficient, it is not factually sufficient to support the jury's answer. An assertion of factual insufficiency of the evidence to support a particular jury finding has validity only if, when all of the evidence is considered and weighed, the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the finding should be set aside. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). There

being some evidence of probative force that Gorman was on business for Tenneco at the time of the accident, the issue was for the jury. *Anderson v. Moore*, 448 S.W.2d 105 (Tex.1969). Since the evidence on the issue was conflicting, the determination of the fact was for the jury. *Air Conditioning, Inc. v. Harrison–Wilson–Pearson*, 151 Tex. 635, 253 S.W.2d 422, 425 (Tex. 1952). To this end, the jury was privileged to draw reasonable inferences from the facts it found were proved. *Burt v. Lochausen*, 151 Tex. 289, 249 S.W.2d 194, 199 (Tex.1952).

■ Jury question number one asked, "do you find from a preponderance of the evidence that at the time of his death, Dale Gorman was in travel and sojourn on the business of Tenneco?" The jury replied, "We do." The record does not reflect that LINA objected to the form of this question. The jury, therefore, was not asked to distinguish evidence of "travel and sojourn" as such evidence was admitted against Tenneco and not against LINA. Accordingly, we hold the evidence that Dale Gorman was in the travel and sojourn of his employer was factually sufficient to support the jury finding.

We overrule LINA's cross-point one.

### Jury Argument

■ In cross-point two, LINA asserts that the jury answered the travel and sojourn question in favor of the plaintiffs because the argument of appellants included incurable jury argument. To obtain reversal of a judgment on the basis of improper jury argument, an appellant must prove (1) an error, (2) that was not invited or provoked, (3) that was preserved by the proper trial predicate, such as an objection, a motion to instruct, or a motion for mistrial, (4) that was not curable by an instruction, by a prompt withdrawal of the statement, or by a reprimand by the judge, and (5) the argument by its nature, degree, and extent, constituted reversibly harmful error. *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839–40 (Tex.1979). The reviewing court must determine if the probability that the improper argument caused

harm is greater than the probability that the verdict was based upon proper proceedings and evidence. *Id.* at 839–40. The improper jury argument must be evaluated in light of the whole case, beginning with voir dire and ending with closing argument. *Luna v. North Star Dodge Sales, Inc.*, 667 S.W.2d 115, 120 (Tex.1984).

■ LINA notes that the argument of appellants included accusations of "bold-faced lies," "misrepresentation and concealment, lies and deceit," "efforts to tailor ... testimony," and efforts "to block the evidence from coming in" by agents of LINA. LINA also points to appellants' argument that an affirmative finding in regard to their claims was necessary for the "widows" of this state, and that it was further necessary for the jury to leave a "legacy" for and send a "message" to Amanda Gorman that would demonstrate that her father was not guilty of cheating on his employer.

LINA's objections to this argument were sustained, but its motions for mistrial were denied. LINA did not request an instruction to the jury to disregard the argument. LINA claims that the jury's affirmative finding to special issue number one was motivated by sympathy, passion, and prejudice brought about by the impermissible jury argument and that the argument was incurable by instruction.

Our review of the record shows that, shortly after the accident, Thornton, a Tenneco supervisor, conducted an investigation. Thornton talked with many of the people who were at the seminar with Gorman on the day of his death, and with people who had been with Gorman at the afternoon meeting at the Tenneco building. Most of these witnesses stated that Gorman expressed an intention to return to the seminar. The results of Thornton's investigation were turned over to Nitsch, corporate counsel for Tenneco. Nitsch also conducted his own investigation and talked to most of the same people as Thornton.

The record shows that Tenneco directed a letter to Mrs. Gorman's counsel that stated, contrary to what the witnesses had told Thornton: "There was no indication that Mr. Gorman was traveling on company business at the time of his accident.... Further, it appears that Mr. Gorman left work early for personal reasons during the afternoon of August 4, 1982."

A few weeks later, Tenneco forwarded the appellants' claim form to LINA. Tenneco did not furnish LINA with the results of its investigation or with the names of the witnesses who had stated that Dale Gorman told them he was returning to the seminar.

The jury also heard evidence that Tenneco responded to appellant's interrogatories over a year after the investigations by stating that "no information or evidence has been discovered or produced to Tenneco, Inc. indicating that Mr. Gorman was in the course and scope of his employment at the time of his automobile accident" and that "there is no indication that Mr. Gorman was returning to the training class in the U.S. Homes Building at the time of his accident," and that "there was conversation indicating that he may have been on his way home at the time of the accident and his secretaries were not advised of his intention to return to the training class."

■ Based on the foregoing, counsel for appellants accused Tenneco of "bald-faced lies," "misrepresentation and concealment, lies and deceit," and efforts "to block the evidence." Counsel may properly argue reasonable inferences from the evidence. *See Reese*, 584 S.W.2d at 837. Whether by cross-examination or advocacy, the jury may be encouraged to weigh, evaluate, and test the evidence before it. *Id.* at 838. Our review of the entire record reveals ample evidence from which the jury could conclude that the corporate representative for Tenneco engaged in misrepresentation of the facts or concealment of the evidence. The jury argument was not improper.

We overrule LINA's cross-point of error two.

### Attorney's Fees

■ The Texas Supreme Court also held that the trial court had jurisdiction to

award attorney's fees. *Gorman*, 811 S.W.2d at 548. The jury found that the Gormans were entitled to reasonable attorney's fees in the amount of $135,500 for services performed by their attorneys through trial, after trial and through the court of appeals, after appeal and through application for writ in the Supreme Court of Texas, and after application for writ and through the Supreme Court of Texas, if writ is granted. A court is authorized to award attorney's fees if the party prevailed on a cause of action under which attorney's fees are authorized. *See American Baler Co. v. SRS Sys., Inc.*, 748 S.W.2d 243, 246 (Tex.App.—Houston [1st Dist.] 1988, writ denied). In the present case, appellants were entitled to recover attorney's fees under section 38.001(8) of the Texas Civil Practice and Remedies Code. We, therefore, render judgment that the appellants be awarded attorney's fees in the amount of $135,500.

We reverse the judgment of the trial court and render judgment that appellant recover $250,000 in insurance benefits under the Tenneco Inc. Travel Accident Insurance Plan from Life Insurance Company of North America. We also render judgment that appellants be awarded $135,500 in attorney's fees. In accordance with the supreme court opinion in this cause, *Gorman*, 811 S.W.2d at 550, the case is remanded to the trial court for a determination of whether the Gormans are entitled to prejudgment interest.

## OPINION ON MOTIONS FOR REHEARING

DUGGAN, Justice.

LINA has filed a motion for rehearing in this cause. We deny its motion for rehearing.

Pamela Gorman has also filed a motion for rehearing. She argues that we should have specified that the judgment includes postjudgment interest, and that we should have rendered prejudgment interest, rather than remanding that issue to the trial court

for determination. We agree on both counts.

### Postjudgment Interest

In rendering judgment, we should "render the judgment ... that the court below should have rendered." Tex. R.App.P. 80(b)(3). Here, the judgment of the court below should have included postjudgment interest at 10 percent per annum from May 14, 1986, the date of judgment, until paid. *See* Tex.Rev.Civ.Stat.Ann. art. 5069–1.05 § 2 (Vernon Supp.1993); *American Paper Stock v. Howard*, 528 S.W.2d 576, 577 (Tex.1975). We render judgment for postjudgment interest.

### Prejudgment Interest

Prejudgment interest is additional damages for the loss of use of money due as damages during the period between the accrual of the claim and the date of judgment. A prevailing plaintiff is entitled to recover prejudgment interest as a matter of law on damages that have accrued by the time of judgment.

*LaCoure v. LaCoure*, 820 S.W.2d 228, 237 (Tex.App.—El Paso 1991, writ denied).

We render judgment for prejudgment interest. We calculate the prejudgment interest as follows:

Amount of Policy: $250,000

Date of Proof of Loss: December 6, 1982

30th Day after Proof of Loss: January 5, 1983 [1]

Date of Judgment: May 14, 1986

Length of Prejudgment Interest: 3.35 years

Rate: six percent, simple [2]

Calculation: 3.35 × 6% × 250,000 = 50,250

We grant Pamela Gorman's motion for rehearing and render judgment for (1) $50,250 in prejudgment interest, and (2) postjudgment interest.

---

**1.** Under Tex.Rev.Civ.Stat.Ann. art. 5069–1.03 (Vernon 1987), interest runs from this date.

**2.** *See* Tex.Rev.Civ.Stat.Ann. art. 5069–1.03 (Vernon 1987).